# EXHIBIT   1

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

---

Page 1

1        IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF KANSAS

3   MARY PATTERSON, Individually,    )
    and TRAVIS PATTERSON,            )
4   Individually,                    )
5                    Plaintiffs,     )
6        vs.                         )Case No.
                                     )12 CV 1308-JAR-KGG
7   CITY OF WICHITA, KANSAS, and     )
    OFFICER J. HENRY,                )
8                                    )
                     Defendants.     )
9   _____ )

10

11

12        Deposition of MARY PATTERSON, taken by the

13  Defendants, City of Wichita, Kansas, and Officer J.

14  Henry, before me, Janelle E. Lindeman, a Certified

15  Shorthand Reporter within and for the State of

16  Kansas, at 301 North Main, Suite 1600, Wichita,

17  Sedgwick County, Kansas, commencing at 9:41 a.m. on

18  the 12th day of February, 2013.

19

20        A P P E A R A N C E S

21        Plaintiffs, Mary Patterson and Travis

22  Patterson, appear by their attorney, James A.

23  Thompson, Klenda Austerman, L.L.C., 301 North Main,

24  Suite 1600, Wichita, Kansas 67202.  Mary Patterson

25  appeared in person.

---

Page 2

1        A P P E A R A N C E S  (cont.)

2        Defendants, City of Wichita, Kansas and

3   Officer J. Henry, appear by their attorney, Chan P.

4   Townsley, Assistant City Attorney, 455 North Main,

5   13th Floor, Wichita, Kansas 67202.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 3

1                  INDEX OF EXAMINATION

2   MARY PATTERSON

3                     DIRECT

4   by Mr. Townsley......4

5

6              INDEX OF EXHIBITS

7   EXHIBIT                                MARKED

8   Number 1...........................32
         Color copy of aerial photo
9   Number 2...........................42
         Color copy of aerial photo
10  Number 3...........................139
         Criminal Investigation Record, 5-9-09
11  Number 4...........................160
         Color copies of photos
12  Number 5...........................164
         Color copies of photos

13

14

15

16

17  SIGNATURE OF WITNESS....................174

18  CERTIFICATE OF REPORTER.................175

19

20

21

22

23

24

25

---

Page 4

1        MARY PATTERSON,
2   having been first duly sworn, was
3   examined and testified as follows:
4
5   DIRECT EXAMINATION
6   BY MR. TOWNSLEY:
7   Q.  Good morning, Mrs. Patterson.  My name is Chan
8   Townsley and I'm the attorney for the City of
9   Wichita and for defendant, Jared Henry, in this
10  case and I'll be taking your deposition.  Have
11  you had an opportunity to talk with your
12  attorney about how depositions work in general?
13  A.  Yes.
14  Q.  You have a basic understanding that this is my
15  opportunity to do discovery and ask some
16  questions and get answers from you?
17  A.  Yes.
18  Q.  Have you ever been deposed before?
19  A.  What is that?
20  Q.  Well, where you sit down in a room like this
21  under oath and talk with attorneys and answer
22  questions?
23  A.  Oh, okay.  Yes.
24  Q.  What was that -- in what kind of a
25  circumstance?

---

Mary Patterson, et al. v                                          MARY PATTERSON
City of Wichita, Kansas, et al.                                  February 12, 2013

Page 5

1  A.  A slip and fall.
2  Q.  When was that?
3  A.  I'm not sure.
4  Q.  Were you a witness or were you the person that
5    slipped and fell or what was --
6  A.  I was the person.
7  Q.  Were you injured?
8  A.  Yes.
9  Q.  And right now you don't remember when that was?
10 A.  No.  It's been awhile ago.
11 Q.  Is that the only time you've been deposed?
12 A.  Yes.
13 Q.  And were you represented by an attorney then?
14 A.  Yes.
15 Q.  Do you remember who that was?
16 A.  Ray Hodge.
17 Q.  For the record, I probably should ask -- well,
18   let me just finish what I started out here
19   before I asked you the deposition question.
20   It's really important that you understand the
21   questions that I ask you, so if I ask you
22   something and you don't understand, will you
23   please say so?
24 A.  Yes.
25 Q.  Because if you answer a question and you

Page 6

1  haven't understood it and we finish up our
2  record and you don't say that, then we're going
3  to think that you understood the question and
4  your answer applies to that question as I asked
5  it.  So it's really important that you let us
6  know if you don't understand, and you'll do
7  that.  Yes?
8  A.  Yes.
9  Q.  Please feel free to take a break at any time if
10   you'd like or ask your attorney a question
11   except when I have a question pending.  I would
12   ask that if I've got a question pending that
13   you answer that, and then if you need to take a
14   break, take it after the answer.
15 A.  All right.
16 Q.  And one other thing.  It's important that you
17   answer yes or no on the questions, a verbal
18   answer because we're making a written record
19   here.  I don't know if you've ever seen a
20   transcript, but it will have a reference for
21   you and what you say and a reference for me and
22   what I say, and if you say uh-huh or huh-uh,
23   those are really hard to understand when
24   they're written down, so a yes or no is
25   preferable if you can, please.

Page 7

1  A.  Okay.
2  Q.  Would you state your name for the record,
3    please.
4  A.  Mary Ann Patterson.
5  Q.  And what's your address?
6  A.  ▓▓▓▓▓▓▓▓▓▓Wichita, Kansas, 67214.
7  Q.  And how long have you lived there?
8  A.  Thirteen years.
9  Q.  So roughly the year 2000 is when you moved in?
10 A.  Yes.
11 Q.  Do you own the home?
12 A.  Yes.
13 Q.  And are you employed?
14 A.  Yes.
15 Q.  What is your employment?
16 A.  Independent Living.
17 Q.  What do you do?
18 A.  I help a disability child.
19 Q.  What sort of hours do you work?
20 A.  Twenty to 23 hours a week.
21 Q.  Do you go stay in-home with the child and watch
22   him or you do that at the Independent Living
23   facility?
24 A.  No, I do that for a child.  She's out -- she's
25   in her own home.

Page 8

1  Q.  So you go to the home and watch the child?
2  A.  Yes.
3  Q.  And how long have you been doing this or how
4    long have you had this specific job?
5  A.  About six months.
6  Q.  And before that, what was your employment?
7  A.  I was doing home health.
8  Q.  Was that also at Independent Living or through
9    Independent?
10 A.  No.  It was -- it was home health, but it
11   wasn't through Independent.
12 Q.  Did you have a period of unemployment before
13   this recent job?
14 A.  No.
15 Q.  So for six months you've been doing disability
16   care for a child through Independent Living,
17   and before that you were doing home health care
18   and that would be just like the middle of last
19   year that you started with Independent.  What
20   were you doing before that?  Who was your
21   employer?
22 A.  I wasn't working.
23 Q.  Was not working, okay.  I'm sorry.  I
24   misunderstood.  When was your last employment
25   before this current job?

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

Page 9

1 A. When was my last job?
2 Q. Yes, that's what I'm asking. When was your
3 last job and what was it?
4 A. '08.
5 Q. And that was a home health job or that was a
6 health care job; right?
7 A. Yes.
8 Q. And do you remember who your employer was?
9 A. Harvey -- Harvey. Forgot his last name.
10 Q. How long did you do that?
11 A. I have been doing that for awhile.
12 Q. That job lasted a long time?
13 A. Until I got hurt.
14 Q. In '08? In 2008 is when you said you stopped
15 at that job?
16 A. Yes.
17 Q. Had you been at that job for like five years,
18 ten years? I mean had you been doing it a long
19 time?
20 A. No.
21 Q. What did you do before that?
22 A. I did day care.
23 Q. And did you do that in your home?
24 A. Uh-huh.
25 Q. Did you do that in your home on Random?

Page 10

1 A. Yes.
2 Q. Did you do it at a location other than
3 Random --
4 A. No.
5 Q. -- like before that?
6 A. No.
7 Q. What did you do before you moved to Random for
8 work?
9 A. I worked at York.
10 Q. What did you do for York?
11 A. I was a brazer.
12 Q. Is that like welding?
13 A. Yes.
14 Q. So you assembled parts, welded parts together?
15 A. I welded parts.
16 Q. What kind of parts?
17 A. Heating and air.
18 Q. Heating and air conditioning units?
19 A. Yes.
20 Q. Is it the ductwork?
21 A. No. It's parts. Small parts.
22 Q. Okay. Thank you. So just so I make sure I'm
23 understanding your employment correctly, for a
24 period of time you worked assembling small
25 parts and how long do you think you did that?

Page 11

1 A. Five years.
2 Q. Five years? Then you moved to your residence
3 on Random Road. You did home health -- home
4 child care there.
5 A. Day care.
6 Q. Day care, and stopped doing that you said in
7 2008 when you were hurt, and then recently have
8 started working doing -- it's a home health
9 care job; correct?
10 A. Right. Yes.
11 Q. Tell me a little bit about yourself. You live
12 at home; correct?
13 A. Yes.
14 Q. Who do you live with today?
15 A. Myself.
16 Q. You live alone?
17 A. Yes.
18 Q. In the past, have you had others live with you
19 at the home on Random Road?
20 A. Yes.
21 Q. Who is that?
22 A. My son and his wife and kids.
23 Q. What's your son's name?
24 A. Travis.
25 Q. And what's his wife's name?

Page 12

1 A. Audre.
2 Q. And they have children?
3 A. Two.
4 Q. What are their ages about today?
5 A. Five -- no. Six and four.
6 Q. They do not live with you now; is that correct?
7 A. No.
8 Q. When did they live with you approximately?
9 A. When did they live with me?
10 Q. Yes.
11 A. The last three or four years.
12 Q. And they have their own place now?
13 A. Yes.
14 Q. How long have they had their own place?
15 A. About five months.
16 Q. Anyone else live with you in the home on
17 Random?
18 A. No.
19 Q. Do you have another son?
20 A. Yes.
21 Q. What's his name?
22 A. Antron.
23 Q. Has he ever lived with you at the house on
24 Random Road?
25 A. Yes.

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

Page 21

1  Q.  Is it possible you have been?
2  A.  No.
3  Q.  No?
4  A.  (Witness shakes head.)
5  Q.  Okay.  So just so I understand, you have not
6  been in Sedgwick County District Court for
7  anything other than this unemployment -- well,
8  the food stamp issue.  Correct?
9  A.  That I remember.
10 Q.  Mrs. Patterson, we're here about an event that
11 happened on or around June 6th, 2010 and I have
12 a number of questions I want to ask you about
13 that, but what I'm going to do is ask you to
14 just give me a brief description of what
15 happened that night, and then we'll go back and
16 ask some more questions.
17    MR. THOMPSON: Objection to the
18    extent it calls for a narrative.
19    MR. TOWNSLEY: Give me just a
20    moment, please.
21    (Discussion held off the record.)
22    BY MR. TOWNSLEY:
23 Q.  Mrs. Patterson, what happened on the evening of
24 June 6, 2010 that has caused you to file a
25 lawsuit?

Page 22

1  A.  I was in my bed because I wasn't feeling good.
2  Q.  Was there a disturbance?
3  A.  Yes.
4  Q.  What happened or what was the nature of that
5  disturbance?
6  A.  I had got up to go and get me some water and I
7  heard a lot of music and a lot of hooping and
8  hollering.
9  Q.  Can you be more specific about the hooping and
10 hollering, what that was?
11 A.  Wrestling and --
12 Q.  Where was that coming from?
13 A.  In front of my house.
14 Q.  Did that concern you?
15 A.  Yes.
16 Q.  Why?
17 A.  Because it was my sons.
18 Q.  So you recognized it was your sons?
19 A.  Yes.
20 Q.  Were they outside?
21 A.  Yes.
22 Q.  Were they loud?
23 A.  Kind of loud.
24 Q.  Were they angry?
25 A.  Yes.

Page 23

1  Q.  Were they fighting?
2  A.  Wrestling.
3  Q.  They were wrestling.  How long did it go on?
4  A.  I'm not sure.
5  Q.  How long did it seem to go on?
6    MR. THOMPSON: Objection, vague.
7    BY MR. TOWNSLEY:
8  Q.  If you understand the question.  You got up
9  from bed; is that correct?
10 A.  Yes.
11 Q.  Had you been asleep?
12 A.  Yes.
13 Q.  You got up for water?
14 A.  Yes.
15 Q.  You weren't feeling good?
16 A.  Right.
17 Q.  What was wrong?
18 A.  I was -- I had took some medicine because I was
19 hurting, my hands and my -- my hands were
20 hurting.
21 Q.  What kind of medicine?
22 A.  Pain pill.  Ibuprofen.
23 Q.  Just Ibuprofen or anything else?
24 A.  I took the Ibuprofen and I laid down.
25 Q.  And then while you're in bed, you got thirsty,

Page 24

1  you got up for water.  What sort of sounds did
2  you hear?
3  A.  Talking loud and wrestling and -- you know,
4  cussing and wrestling.
5  Q.  And you could hear it through the walls?
6  A.  I could hear it through the window.  I'm
7  standing up at the window.  There's a window.
8  Q.  So what did you do?
9    MR. THOMPSON: Objection, vague.
10    BY MR. TOWNSLEY:
11 Q.  What did you do when you heard them cussing and
12 wrestling through the window?
13 A.  What did I do?  I ran out to go see what was
14 going on.
15 Q.  Were you concerned?
16 A.  Yes.
17 Q.  Were you concerned somebody might be hurt?
18 A.  Yes.
19 Q.  Were they hitting each other?
20 A.  No.
21 Q.  Was one brother hitting the other brother?
22 A.  No.
23 Q.  Was anybody hitting anybody?
24 A.  They were wrestling.  They were wrestling.
25 They were hugged up (indicating).

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

---

Page 25

1  Q.  Did they do anything but wrestle at any time
2    that you saw?
3  A.  No.
4  Q.  Who all was there?
5  A.  Travis and Twan.
6  Q.  Audre?
7  A.  And Audre.
8  Q.  Yourself?
9  A.  Myself.
10 Q.  Anyone else?
11 A.  At that time, no.
12 Q.  And what was Audre saying?
13 A.  I called her.  She was in the back.
14 Q.  And what did she say when you called her?
15 A.  She answered and came to where I was.
16 Q.  Did she see the boys fighting?
17    MR. THOMPSON:  Objection, misstates
18    testimony.
19    BY MR. TOWNSLEY:
20 Q.  Did she see the boys fighting?
21 A.  She seen them wrestling.  We never saw any
22    fighting.
23 Q.  Did they -- have they ever told you at any time
24    that they were fighting --
25 A.  No.

---

Page 26

1  Q.  -- other than wrestling?
2  A.  No.
3  Q.  Were they having fun?
4  A.  No.
5  Q.  Were they sweating?
6  A.  Yes.
7  Q.  Had they been at it awhile?
8    MR. THOMPSON:  Objection, vague.
9    BY MR. TOWNSLEY:
10 Q.  Had they been wrestling long enough to get
11    sweaty?
12 A.  Yes.
13 Q.  They were sweaty when you went out?
14 A.  Yes.
15 Q.  Audre was in the back of the house or where was
16    she when you called her?
17 A.  In the back room.
18 Q.  Is that away from the street?
19 A.  Yes.
20 Q.  And where is your bedroom -- or where was the
21    room where you stood by the window?  Let me ask
22    you that.
23 A.  In the back.
24 Q.  In the back.  Okay.  So where were the boys
25    wrestling?  Front or back?

---

Page 27

1  A.  They were in the front yard.
2  Q.  So you heard them when you were in the back of
3    the house and you came and saw them through a
4    window that looked out the front?
5  A.  No.  No.  I got up to go get me some water and
6    there's a window in front of my sink.
7  Q.  So you didn't hear them until you got to that
8    window?
9  A.  Yes.
10 Q.  Okay.  Where was Audre when you called her?
11    Was she -- or what was Audre doing when you
12    called her?
13 A.  I don't know.
14 Q.  But she was in the back of the house; is that
15    correct?
16 A.  She was in the back room.
17 Q.  What did you do when you went outside?
18 A.  I tried to break 'em apart.
19 Q.  How did you do that?
20 A.  I tried to pull 'em apart.
21 Q.  You physically pulled on them?
22 A.  Well, I tried to break 'em up.
23 Q.  Did you say anything to them?
24 A.  Yes.
25 Q.  Did you say "stop fighting"?

---

Page 28

1  A.  "You all stop all this", yes.
2  Q.  Did you say it loudly?
3  A.  Yes.
4  Q.  Did it work?
5  A.  No.
6  Q.  Was that frustrating?
7  A.  Yes.
8  Q.  How long did you try to break up the fight?
9    Who did you grab?  What do you remember?
10    MR. THOMPSON:  Objection.  It
11    assumes facts not in evidence.
12    BY MR. TOWNSLEY:
13 Q.  Okay.  I will rephrase that.  You physically
14    put hands on one of your sons to help to try
15    and separate them; is that correct?
16 A.  Yes.
17 Q.  Which son?
18 A.  Travis.
19 Q.  How about Antron?
20 A.  I'm on both of 'em.
21 Q.  Who was putting more energy into the wrestling
22    with the brother, Antron or Travis or was it
23    the same?
24 A.  The same.
25 Q.  Did Travis get a bloody lip this way?

---

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

Page 29

1  A.  I don't know.
2  Q.  Did anybody get bloodied in this wrestling
3  match?
4  A.  Yes.
5  Q.  Who?
6  A.  Travis.
7  Q.  And how was he hurt?
8  A.  His lip (indicating).
9  Q.  Was his lip split or cut?
10 A.  I saw blood. I don't know.
11     MR. TOWNSLEY: Why don't we take
12 just a short break for a minute.
13     MR. THOMPSON: Okay.
14     (A brief recess was taken.)
15     BY MR. TOWNSLEY:
16 Q.  Mrs. Patterson, you said that you saw blood and
17 that Travis had gotten hurt during the
18 wrestling, that he had split his lip -- well,
19 you didn't say split his lip. You said you saw
20 blood. Was there blood on Antron also on his
21 shirt?
22 A.  I couldn't tell.
23 Q.  And I'm still talking about when you first had
24 gone out to see your sons wrestling in the
25 yard. So you're not certain; is that correct?

Page 30

1  A.  Right.
2  Q.  Do you remember anything of what the boys were
3  saying while they were wrestling?
4  A.  I really don't remember what they were saying.
5  Everything was happening so fast.
6  Q.  When you were unable to stop the boys from
7  wrestling, what did you do or what did you say?
8  A.  I told 'em if they didn't stop I was going to
9  call the police because I didn't want nobody to
10 get hurt.
11 Q.  Did you ever call the police?
12 A.  Audre did.
13 Q.  You did not; is that correct?
14 A.  No.
15 Q.  When did you find out Audre had called the
16 police?
17 A.  She came back out and she said, well, I called
18 the police.
19 Q.  So during this wrestling match, you're outside
20 in the yard, Antron's in the yard, Travis is in
21 the yard and Audre is in the yard; is that
22 correct?
23 A.  Yes, after she came back out.
24 Q.  And I was going to say at some point she goes
25 inside and makes a phone call or did she ever

Page 31

1  come out before she called the police?
2  A.  She came out. We tried to stop 'em.
3  Q.  So she came out.
4  A.  We tried to stop 'em. We couldn't, so I told
5  her to go call the police.
6  Q.  And then she left, went inside and called?
7  A.  Yes.
8  Q.  So she's inside the house when she makes her
9  phone call to the police?
10 A.  Yes.
11 Q.  Or to 911?
12 A.  Yes.
13 Q.  And then she comes back out; correct?
14 A.  Yes.
15 Q.  And told you that she had called the police?
16 A.  Yes.
17 Q.  And what did Travis and Antron do?
18 A.  They was just steady locked up.
19 Q.  Where is this taking place? Is it in your
20 yard?
21 A.  In my front yard.
22 Q.  I'm going to show you a picture. This is not
23 great resolution, but it's an aerial shot of
24 Random Road. Can you tell me, is this your
25 house (indicating)?

Page 32

1  A.  Yes.
2  Q.  I'm going to go ahead and mark this as
3  Exhibit 1.
4     (Marked for identification
5     Deposition Exhibit Number 1.)
6     BY MR. TOWNSLEY:
7  Q.  Now you have the house that is at the top of
8  the picture with the white car -- or it looks
9  like a white car in the driveway; is that
10 correct?
11 A.  It's gold.
12 Q.  It's gold. Okay. Is that your car?
13 A.  Yes.
14 Q.  What year of car is that?
15 A.  2002.
16 Q.  How long have you had that?
17 A.  Since 2003 or 4.
18 Q.  Okay. Thank you. What I would like you to do
19 if you could, would you put a circle in the
20 yard where the boys are wrestling.
21 A.  (Witness complies.)
22 Q.  You've drawn a circle and I was going to put a
23 1 in but it almost looks like there's a 1.
24 I will put a 1 anyway like that. Do you see
25 that?

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

Page 41

1  A.  We're all standing right out here (indicating).
2  Q.  And at this point you're now pointing to the
3  end of the driveway; correct?
4  A.  Right.
5  Q.  And you're talking about the area between the
6  sidewalk and the street but in the driveway;
7  right?
8  A.  Right.
9  Q.  So at this point Travis does what?  He moves --
10  A.  He goes back (indicating).
11  Q.  So he moves in the yard towards where the
12  circle is with the number 1.
13  A.  Yes.
14  Q.  Okay.  What does Shannon do?
15  A.  She tells Twan to come on and they go to get in
16  the van.
17  Q.  Does she make the statement "I don't want to be
18  involved in this and I'm leaving"?
19  A.  She said something about -- yeah, yes, that she
20  was leaving and that's between Twan went on and
21  went to go to get in the car with her.
22  Q.  Does Shannon get in the van?
23  A.  She gets a chance to get in the van.
24  Q.  So she's in the driver's seat; correct?
25  A.  Yeah, she's getting in the van.  Twan goes

Page 42

1  around to get in the van and that's when
2  everything happens.
3  Q.  Okay.  And what you just indicated was that he
4  goes around the front of the van to go to the
5  passenger door; correct?
6  A.  Yes.
7  Q.  And you say that's when everything happens.
8  A.  Yes.
9  Q.  What happens when he goes around to get into
10  the van?
11  A.  500 polices come around the corner.
12  Q.  And what do they do?
13  A.  They cussing.  They -- about three or four of
14  'em went over and slammed him down, and then
15  they were flashing lights -- car lights,
16  lights, flashlights, in everybody's face.
17  Q.  Which direction did the police come from?
18  A.  From around Piatt.
19     (Marked for identification
20     Deposition Exhibit Number 2.)
21     BY MR. TOWNSLEY:
22  Q.  I'm going to go ahead and mark Deposition
23  Exhibit 2 and, Mrs. Patterson, is this an
24  aerial view of Random Road that shows your
25  house?

Page 43

1  A.  Yes.
2  Q.  This is a little bigger view than the one we've
3  marked as Exhibit 1, isn't it?
4  A.  Okay.
5  Q.  And is this your home here (indicating)?
6  A.  That's my house.
7  Q.  I'm going to put just a circle on the roof to
8  show the house; is that correct?
9  A.  Yes.
10  Q.  All right.  Now on this, can you tell me which
11  direction the police came from?
12  A.  This direction, Piatt.  This is Piatt.
13  Q.  And is Piatt this street or this street just so
14  I know?  This is the Random that curves; right?
15  A.  Yes, this is Random that curves, but it goes
16  into Piatt.
17  Q.  It's Piatt across the street?
18  A.  Yeah, this is Piatt (indicating) and this is
19  Random Road (indicating).
20  Q.  So what you've pointed to is that the officers
21  came from the south --
22  A.  Yes.
23  Q.  -- on Random Road; correct?
24  A.  Yes.
25  Q.  We don't have that on there.  I once again will

Page 44

1  just put an S and an N.  This is upside down
2  because I'm reaching across the table, but
3  that's north and south to that picture;
4  correct?
5  A.  Yes.
6  Q.  Okay.  The police come around the corner and
7  they're cussing.  What are they saying if you
8  could tell us, please?
9  A.  "Shut the fuck up.  Get the fuck back.  Get the
10  fuck back."
11  Q.  Are they saying "get down"?
12  A.  No.
13  Q.  Just back?
14  A.  Yeah.
15  Q.  Just "get back"?
16  A.  Yes.  "Shut the fuck up, get the fuck back."
17  They was using --
18  Q.  Did this happen quickly?
19  A.  Yes.
20  Q.  Things moving fast?
21  A.  Yes.
22  Q.  Confusing?
23  A.  Yes.
24  Q.  Antron at this point is around the front of the
25  van; correct?

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

---

Page 45

1 A. He's getting in the van.
2 Q. He's just about -- he's around the passenger
3 door when the cops are running up?
4 A. Yes.
5 Q. Where were you at that point?
6 A. When the cops -- when the cops came around, I
7 was here (indicating). I was standing here
8 (indicating).
9 Q. You're indicating about the middle of your
10 driveway; correct?
11 A. Well, I'm right -- we're standing here
12 (indicating) because we are out in the street,
13 me, Shannon and Audre.
14 Q. And Shannon's gotten into the vehicle; correct?
15 A. Right.
16 Q. And then Antron has gone around to get into the
17 vehicle and the officers come up from the
18 south?
19 A. Yes. Made her get out.
20 Q. Well, what did they -- did they make her get
21 out or did they do something with Antron first?
22 A. They throwed him to the ground first.
23 Q. Okay. Do you know what he did when they went
24 up to him?
25 A. He didn't have time to do nothing.

---

Page 46

1 Q. Could you see him?
2 A. Yes.
3 Q. Aren't you standing on the other side of the
4 van?
5 A. Yes. I'm standing like right here (indicating)
6 in the street.
7 Q. Let's do this. Initially you said you were
8 right at the end of the driveway; correct?
9    MR. THOMPSON: Objection, vague.
10 A. Well, I'm already here (indicating).
11    BY MR. TOWNSLEY:
12 Q. I'm going to put an A right there, and A is the
13 position where you, Shannon and Audre were at
14 one point; correct?
15 A. Yes.
16 Q. And then Shannon goes over and gets in the
17 driver's side of the van; correct?
18 A. Yes.
19 Q. Antron has gone over towards the passenger
20 door; correct?
21 A. Yes.
22 Q. Going around the front of the van. Where do
23 you go?
24 A. When I see all the polices, I goes right here
25 (indicating) and I stop on the other side of

---

Page 47

1 this van.
2 Q. We'll put a B there.
3 A. And I stops right there and I get to hollering
4 at the polices and everything because he's
5 hollering he can't breathe and they were all on
6 top of him. The one lady was sitting all up on
7 his head.
8 Q. Where are the -- you're standing where the B is
9 in the street at the point when the officers
10 reach Antron; is that correct?
11 A. Yes. I came right there, yes (indicating).
12 Q. And do you know if he had the door open to the
13 vehicle?
14 A. He got a chance, I think, to -- he got
15 around -- he went around and got ready to open
16 the door or whatever, but then that's when they
17 bum-rushed him.
18 Q. So he was opening the door when they got to
19 him?
20 A. To get in, yes.
21 Q. And do you know, did he say anything to the
22 police?
23 A. He didn't say nothing.
24 A. He didn't say anything at all.
25 A. Not that I recall.

---

Page 48

1 Q. So he may have but you don't recall him saying
2 anything; is that correct?
3 A. He didn't say anything.
4 Q. He did not say anything. You didn't hear him
5 say "I don't have to do what the police tell me
6 to do"?
7 A. No.
8 Q. Is it your testimony he did not say that or
9 that you didn't hear him say it?
10 A. I didn't hear him say it.
11 Q. You said that the police throw him to the
12 ground. Can you describe that?
13 A. Yes. When he went to go to get in the van, it
14 was three or four polices that just went over
15 and just slammed him down (indicating). The
16 one -- the lady with the -- it was a lady with
17 blonde hair with the ponytail, she was sitting
18 on his head. You had two other -- you had
19 other polices that was holding him, so they
20 were all on top of him.
21 Q. Were they trying to handcuff him, do you know?
22 A. No.
23 Q. And if you're in the street, where do they have
24 him on the ground?
25 A. On this side of the van (indicating).

---

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

Page 49

1 Q. Can you --
2 A. Because when they went to go --
3 Q. -- put another circle where they have him down.
4 A. They have him down on this side of the ground
5 (indicating).
6 Q. Let's put a C there if you would, please.
7 A. (Witness complies.)
8 Q. So the C is the location where Antron is down
9 on the ground --
10 A. Yes.
11 Q. -- with officers.
12 A. Yes.
13 Q. So they have pulled him towards the back -- or
14 he's at least ended up at the back of the van.
15 A. Yes.
16 Q. And how can you -- or can you see him directly?
17 Are you behind the van also where you can see
18 him or are you looking --
19 A. I'm looking right dead at them because, see, I
20 was at the end of the van. I never did go past
21 the van. Just right there on the end of the
22 van and I was hollering at the officers to get
23 off of him, let him breathe and for him to be
24 quiet because they was twisting his thumbs,
25 they was doing all kinds of stuff and he's

Page 50

1 hollering at me, and I'm telling them to at
2 least let him breathe, let him get up or
3 something, you know. I'm just furious because
4 of all of this happening.
5 Q. When you moved from the point that is A to the
6 point that's B, did you move quickly to see
7 what was going on? Did you move over there
8 slowly? Did you walk over? What's going on
9 here?
10 A. That's when me, Audre and all of us moved this
11 way (indicating). See, we all came -- we came
12 up here because we were, you know, hollering at
13 the polices and trying to get them to get off
14 of him.
15 Q. So when the police take Antron to the ground at
16 the back of the van, you and Audre go over to
17 where the police are and are hollering at them
18 to get --
19 A. No, no, no, we don't go to where the police
20 are. We go to right here on this side of the
21 van right here (indicating). The polices are
22 all over here (indicating) and coming from
23 around this corner (indicating). They're
24 coming from around -- from around here with all
25 the lights, all the flashlights and all the --

Page 51

1 you know, the cussing and everything.
2 Q. So when the first officers come up and are
3 approaching where Antron is, there's
4 flashlights shining?
5 A. They're running around the corner with
6 flashlights. They had car lights. It was
7 everything -- you couldn't see nothing because
8 they were flashing lights. It was the car
9 lights and it was the flashlight. Everybody
10 had flashlights and they're all up in your face
11 like this (indicating).
12 Q. What car lights?
13 A. The police cars.
14 Q. So they drove police cars up to --
15 A. Some drove police cars and some ran.
16 Q. Did the police cars come up directly to the
17 location at this point or later?
18 A. After -- after they -- after everybody
19 bum-rushed and started running, the cars came
20 up. The cars came up like in here (indicating)
21 because this was all blocked off
22 (indicating), the street.
23 Q. Was that a couple minutes after the police come
24 up and get Antron, at the same time or --
25 A. No, I didn't say that.

Page 52

1 Q. No, I'm asking you.
2 A. All of it happened about the same time.
3 Q. And you and Audre are standing at the position
4 that's marked by the B there and you were
5 yelling at the officers -- you're yelling at
6 Tron to quit fighting; is that correct?
7 A. To quit talking because he was -- he was saying
8 stuff and I guess he was trying to get 'em off
9 of him and they had him pinned. He couldn't do
10 anything.
11 Q. You're telling him to quit whatever he's doing
12 and you're telling the officers to let him go;
13 correct?
14 A. Yes, to get off of him, he said he couldn't
15 breathe and he's kind of a big guy.
16 Q. And are you doing this -- what's your tone of
17 voice?
18 A. "You all -- you all get off of him. He won't
19 be doing that. Get off of him, he can't
20 breathe. You all twisting his fingers and
21 stuff, leave him alone, you know, let him get
22 up. Twan, be quiet, you know."
23 Q. What happens next?
24 A. The next thing I know I was on the ground and I
25 was trying to tell them that I was his mama --

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

---

Page 53

1  that I was the mama. **They didn't pay me no**
2  **mind.**
3  Q.   Between telling Tron to quit what he's doing
4  and telling the officers to let him up, I think
5  you said lots of flashlights in everybody's
6  faces.  Is that correct?
7  A.   **Yes.**
8  Q.   Did you have a flashlight in your face?
9  A.   **Yes.**
10 Q.   I'm sorry?
11 A.   **Yes, they flashlights in everybody's face.**
12 Q.   And you had one in your face.
13 A.   **Yes.**
14 Q.   And did the officer say anything to you that
15 had the flashlight?
16 A.   **"Get the fuck back."**
17 Q.   Did any of the other officers say anything to
18 you?
19 A.   **No.**
20 Q.   Did any of the officers with Tron say anything
21 to you -- Antron.  I'm sorry.
22 A.   **No.**
23 Q.   Is it possible they did and you don't recall?
24 A.   **No.**
25 Q.   Is it possible any of the other officers were

---

Page 54

1  telling you to get back away from the area with
2  Antron?
3  A.   **No, because I wasn't in that area.  I'm in the**
4  **street on the side of the van and they in the**
5  **yard on the other side of the van.**
6  Q.   How far away from the sidewalk -- or how far
7  away from the curb are you?
8  A.   **I'm on the other side of this van (indicating)**
9  **so I'm on this side.  They over here by the**
10 **curb.**
11 Q.   So you're in the middle of the street?
12 A.   **I'm right here (indicating).**
13 Q.   Okay.  You remember having a flashlight in your
14 face.  What happens next?
15 A.   **I found myself getting up off the ground --**
16 **well, I felt myself on the ground with a police**
17 **on top of me.**
18 Q.   Which way were you laying on the ground?  Were
19 you on your back, were you on your stomach?
20 A.   **I was on my side.  On my left side.**
21 Q.   Which way are you facing?  Where is your head?
22 North or south?
23 A.   **My head is this way (indicating).**
24 Q.   So towards the back of the van?
25 A.   **Yes, across the van but turned like this, yes.**

---

Page 55

1  Q.   So you're on the street facing the south on
2  your left side.
3  A.   **Yes.  Facing the south?  That's not right.  I'm**
4  **right here (indicating) and I'm turned facing**
5  **the way that my son is.  So I'm like -- I'm**
6  **like this (indicating), you know, talking**
7  **across over at the van.**
8  Q.   Yes.
9  A.   **The van is right here (indicating) and I'm**
10 **standing right here (indicating).**
11 Q.   Okay.  So you are standing at the -- in the
12 street at the back of the van facing somewhat
13 the same direction as the back of the van.
14 A.   **Yes, facing where they were over on the side.**
15 Q.   Okay.  Which would be east?  Yes, you would be
16 facing east?
17 A.   **Uh-huh, talking at -- talking at them and**
18 **talking at him.**
19 Q.   And that's when you're standing up; right?
20 A.   **Yes.**
21 Q.   And a flashlight in the face; correct?
22 A.   **Yes.**
23 Q.   Then you're on the ground; correct?
24 A.   **Yes.**
25 Q.   And you're facing south and your left side

---

Page 56

1  down; correct?
2  A.   **Yes.  Facing where Twan and them were.**
3  Q.   And do you know where Travis is at this point?
4  A.   **Travis is standing up over here by the car**
5  **(indicating).**
6  Q.   Okay.  When did he leave the yard?
7  A.   **Well, when all the polices came out, it was a**
8  **police talking to him and he was standing out**
9  **here right behind the car, and the police --**
10 **everybody was in the street.  The police was in**
11 **the street.  He was talking to Travis over here**
12 **right by the curb (indicating).**
13 Q.   Is this while Antron's being --
14 A.   **Yes.**
15 Q.   -- taken into custody?
16 A.   **Yes.**
17 Q.   There's an officer talking to Travis on the
18 curb?
19 A.   **Yes.  He's standing right here talking to him**
20 **(indicating).**
21 Q.   So he's standing on the curb.
22 A.   **Yeah, he's standing right here by the curb**
23 **(indicating).**
24 Q.   Shannon is still in the vehicle or --
25 A.   **No.  Everybody's out.  They made her get out.**

---

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

Page 61

1  flashing lights. The lights from the cars was
2  on. All I felt was to the ground. There were
3  lights already flashing. They were already
4  flashing lights, but the guy that hit me didn't
5  flash no light. All I got was a hit from him.
6  Q.  He didn't say anything to you?
7  A.  No.
8  Q.  He hadn't told you to back up first?
9  A.  No. They were hollering that coming down the
10 street. See, they were hollering before they
11 got to us.
12 Q.  When they came down the street, you were
13 standing at the end of your driveway, Point A;
14 correct?
15 A.  No, I was standing -- well, when they grabbed
16 Twan, I left from here (indicating) and went to
17 here (indicating).
18 Q.  Okay.
19 A.  And I stood right here (indicating) on this
20 side of the van (indicating).
21 Q.  You went up at the same time as they grabbed
22 Antron and then you were standing on the other
23 side of the van?
24 A.  When they grabbed Antron, I immediately come to
25 the corner here to tell them that I was the

Page 62

1  mama -- that I was their mama and if they could
2  get off of him and let him breathe and quit
3  twisting his fingers and for him to be quiet,
4  and I'm standing right here saying this to him
5  on this side of the van (indicating).
6  Q.  And what's your demeanor at the time? I think
7  you've already said you were angry, you're
8  frustrated; correct?
9  A.  Yeah. Yes.
10 Q.  You did not -- well, do you ever go into the
11 grass on the side of the street near Antron?
12 A.  No.
13 Q.  And then you're in the street with Audre, with
14 Shannon and an officer strikes you in the
15 throat and knocks you to the ground; is that
16 correct?
17 A.  Yes.
18 Q.  And he's come from the south.
19 A.  Yes.
20 Q.  And you land with your head facing the south;
21 correct?
22 A.  Yes. Facing where they are over here
23 (indicating) because that's where I fell on the
24 side of my --
25 Q.  Facing the east then?

Page 63

1  A.  Facing where they at over here (indicating).
2  Q.  Okay. Then what happens?
3     MR. THOMPSON: Objection, vague.
4  BY MR. TOWNSLEY:
5  Q.  Can you tell me what happens immediately after
6  this, Mrs. Patterson?
7     MR. THOMPSON: Same objection.
8  A.  Immediately after that after he throws me down
9  on the ground, I don't know how long I was on
10 the ground.
11    BY MR. TOWNSLEY:
12 Q.  What's he doing while you're on the ground? Is
13 he taking your arms?
14 A.  No. He's on top of me. He's just laying on --
15 he's on top of me (indicating).
16 Q.  From head to toe?
17 A.  Yes.
18 Q.  So he's got his full body on top of you?
19 A.  Yes.
20 Q.  Did anything happen to break your fall?
21 A.  No.
22 Q.  So you struck the ground in an unbroken fall
23 with an officer on top of you; is that correct?
24 A.  Yes.
25 Q.  Does the officer say anything to you?

Page 64

1  A.  No.
2  Q.  Does the officer take your arms?
3  A.  No.
4  Q.  Does the officer tell you you're under arrest?
5  A.  No.
6  Q.  So does he attempt to handcuff you?
7  A.  No.
8  Q.  Did he attempt to handcuff you before you went
9  to the ground?
10 A.  No.
11 Q.  How long was the officer on top of you?
12 A.  I don't know.
13 Q.  A couple minutes?
14 A.  I don't know.
15 Q.  A couple seconds?
16 A.  I don't know. Everything was so fast. I don't
17 know how long he was on me or what.
18 Q.  It was a pretty fluid situation, isn't it?
19 Things are happening quickly?
20 A.  Yes.
21 Q.  When does the officer get off of you?
22 A.  I felt a -- I felt the pressure come off me and
23 I thought it was one of the polices had pulled
24 him off of me, but it wasn't. They were just
25 standing around looking. My son came over and

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

Page 65

1 pulled the officer off of me.
2 Q. And you're talking about Travis; correct?
3 A. Yes. And after --
4 Q. Now you say you felt the pressure come off and
5 the officers were standing around. Where were
6 they?
7 A. Just standing all around.
8 Q. How many officers are there at this point, do
9 you think?
10 A. To my knowledge, it was about seven, eight. I
11 don't know how many it was. All I know is a
12 bunch of 'em.
13 Q. More than five?
14 A. Yes.
15 Q. Where is Antron at this point?
16 A. They still got him down on the ground.
17 Q. So same place where he was.
18 A. Uh-huh.
19 Q. Several officers over there?
20 A. The same ones that went over there, they were
21 there.
22 Q. Where are the other officers standing around?
23 A. In the street.
24 Q. And at this point, something causes the
25 pressure to come off of you; correct?

Page 66

1 A. Yes.
2 Q. And it's your understanding that's Travis
3 pushing the officer off of you; correct?
4 A. No. I thought it was another police pulled him
5 off of me, but it was Travis that pulled him
6 off of me. He seen him attack me and he pulled
7 him off of me.
8 Q. Now I didn't ask you, but what are the officers
9 wearing?
10 A. Uniforms.
11 Q. All of them?
12 A. Yes.
13 Q. Pretty clear they're police when they arrive?
14 A. Yes.
15 Q. You didn't have any question that they were
16 police; correct? You understood they were
17 police; correct?
18 A. Yes.
19 Q. Did you see Travis do anything to take the
20 officer off of you?
21 A. After he realized, I guess, what he had done,
22 he threw his hands up and said "did you all
23 see that man on top of my mama, did you all see
24 that man on top of my mama" and he had his
25 hands up. He immediately throwed his hands up.

Page 67

1 Q. Now you said he did that after he realized what
2 he had done; correct?
3 A. I guess after he realized that he had got the
4 cop off of me.
5 Q. Why do you think he didn't realize it was a cop
6 that he was pushing before he pushed him?
7     MR. THOMPSON: Objection.
8     Misstates the evidence and testimony.
9 A. I don't know.
10 BY MR. TOWNSLEY:
11 Q. So has Travis talked to you about this event?
12 A. Have he talked to me?
13 Q. Yes.
14 A. Like what?
15 Q. Have you ever talked with Travis about this?
16 A. We've talked.
17 Q. Has he told you that he didn't know that was a
18 police officer before he pushed him?
19 A. Right. Yes. That he had carpal tunnel,
20 whatever that is, you know, I guess it blinds
21 you to what's going on or whatever.
22 Q. So he's told you that he didn't realize it was
23 a cop until after he went over and pushed.
24 A. That's when he immediately throwed his hands up
25 (indicating).

Page 68

1     MR. THOMPSON: Objection.
2     Misstates the testimony.
3     BY MR. TOWNSLEY:
4 Q. And do you know why he may have not -- may not
5 have been able to perceive that they were
6 police officers? Any reason other than what
7 you just described?
8     MR. THOMPSON: Objection, calls for
9     speculation.
10 BY MR. TOWNSLEY:
11 Q. Is it correct he had been drinking that night?
12 A. Yeah, they had been out.
13 Q. Is it correct he was under the influence of
14 alcohol?
15     MR. THOMPSON: Objection, calls for
16     speculation.
17     MR. TOWNSLEY: I'm asking for her
18     opinion.
19     BY MR. TOWNSLEY:
20 Q. Did you see your son under the influence of
21 alcohol that night? And I'm referring to
22 Travis.
23     MR. THOMPSON: Objection, calls for
24     a legal conclusion.
25 A. No.

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

Page 69

1  **BY MR. TOWNSLEY:**
2  Q.  You didn't see Travis under the influence of
3  alcohol?
4      **MR. THOMPSON:** Objection, calls for
5      a legal conclusion.
6      **BY MR. TOWNSLEY:**
7  Q.  You didn't see any evidence that night that
8  appeared that your son, Travis, had had alcohol
9  and was feeling the effects of it?
10     **MR. THOMPSON:** Objection, calls for
11     a legal conclusion --
12 **A.  I know that they had went out --**
13     **MR. THOMPSON:** Hold on.  Objection,
14     calls for a legal conclusion and a
15     medical conclusion.  You may answer.
16     **BY MR. TOWNSLEY:**
17 Q.  Now you can answer.  We do the objection for
18 the record but then you can answer.
19 **A.  Now could you repeat that?**
20 Q.  I asked if you had seen any evidence that night
21 that made you believe that your son, Travis,
22 had not only consumed alcohol but was feeling
23 the effects of the alcohol.
24 **A.  I knew that they had went out and I know that**
25 **they had been drinking because they went to a**

Page 70

1  **bar.**
2  Q.  Is it possible that his drinking was the reason
3  that he didn't recognize it was a police
4  officer that he was trying to push off of you?
5      **MR. THOMPSON:** Objection, calls for
6      speculation, medical conclusion and a
7      legal conclusion.  You may answer.
8      **BY MR. TOWNSLEY:**
9  Q.  You can answer.
10 **A.  I don't know.**
11 Q.  Did you see him -- what did you see him do
12 after the pressure comes off of you -- I'm
13 sorry.  After the pressure comes off meaning
14 that you don't feel the weight of the officer
15 on you any longer, what did you see Travis do?
16 **A.  Turn around and throw his hands up.**
17 Q.  And you saw him do that.
18 **A.  Yes.  He said "ain't nobody going to help?".**
19 Q.  Were there any other officers nearby --
20 immediately by you and the officer that was on
21 top of you?
22 **A.  Yes.**
23 Q.  What did that officer do?
24 **A.  Stood there.**
25 Q.  Did you see that officer do anything with

Page 71

1  Travis?
2  **A.  He didn't do anything.**
3  Q.  Did you see Travis push that officer?
4  **A.  No.**
5  Q.  Did you see that officer step in front of
6  Travis as he came towards you?
7  **A.  No.  No.**
8  Q.  Did you see Travis as he was approaching where
9  you were with the weight on top of you?
10 **A.  No, because my back was turned (indicating).**
11 Q.  So you didn't see him approach.  When did you
12 roll over to look back that direction -- or let
13 me rephrase that.  You're on the ground with
14 your head somewhat towards the east on the left
15 side.  You've fallen down -- or you're on the
16 street somewhere near where the B is on that
17 drawing.
18 **A.  Uh-huh.**
19 Q.  Where is Travis when you see him with his arms
20 up?
21 **A.  He's right out here in the street (indicating).**
22 Q.  So is he behind you or in front of you or at
23 your feet or --
24 **A.  He's behind me because, see, I'm laying -- I'm**
25 **laying this way (indicating).  When the officer**

Page 72

1  **came, he hit me and I laid this way**
2  **(indicating), so everything is behind me.  So**
3  **Travis was standing up here (indicating).  When**
4  **I got a chance to get myself to turn around to**
5  **see what was going on, he was standing right**
6  **there (indicating) with his hands up.**
7  Q.  Now what you just said was that you were laying
8  here in the street (indicating); correct?
9  **A.  Yes.**
10 Q.  You're laying with your head on this end
11 (indicating)?
12 **A.  My head is this way (indicating).**
13 Q.  Where are your feet?
14 **A.  My feet are down this way (indicating).  These**
15 **are my feet (indicating), this is my head and**
16 **I'm laying this way (indicating) and I'm on my**
17 **side so I'm on my left side.  Yes.**
18 Q.  Now I've put a very crude stick figure in there
19 to show where you're laying down because that's
20 a little different than the position you told
21 me before.
22 **A.  I don't see how.**
23 Q.  Well, I thought you were laying -- okay.  So
24 you're laying beside the van.  Your head is
25 facing east and you're on your left side.

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

1  just heard the noise and I seen all of the
2  friction from it.
3  Q.  So it's like sparks and lights all around?
4  A.  Yeah, just friction -- just everywhere. It
5  would blind you.
6  Q.  All around you, all around Travis?
7  A.  Yeah, it was like blinding when he Tased it --
8  when he used the Taser.
9  Q.  And then it all happened again?
10  A.  He just (indicating) -- did it -- he did it
11  twice.
12  Q.  Can you tell me did it go on for five seconds
13  or ten seconds or --
14  A.  I don't know how long it was but it was a
15  minute or so. I'm saying, you know, it took
16  awhile but it was -- I don't know how long it
17  was.
18  Q.  Was that a hard thing for you to watch, seeing
19  your son be Tased?
20  A.  Yes. Yes.
21  Q.  Did that upset you?
22  A.  Yes.
23  Q.  Make you angry?
24  A.  Yes.
25  Q.  Anything else that you think happened wrong

1  stunned.
2  Q.  And you got arrested that night?
3  A.  Yes.
4  Q.  Did you find that humiliating?
5  A.  Yes.
6  Q.  How so? Can you tell me?
7  A.  Because they didn't do it the right way. They
8  didn't come ask no questions why I was trying
9  to holler at 'em and tell 'em what was going
10  on. They wasn't listening to me.
11  Q.  What else?
12  A.  And I told 'em that I was the mama and that I
13  had everything under control.
14  Q.  So this was humiliating for you because they
15  didn't come to you, they didn't ask questions
16  and they didn't listen to what you wanted to
17  tell them; is that correct?
18  A.  Yes. They didn't listen to nobody.
19  Q.  How else has the arrest been humiliating for
20  you?
21  A.  They sit me on the curb for about 15, 20
22  minutes, and then another car pulled -- another
23  police car pulled up. He told me to go sit in
24  that car, and I said "am I under arrest", no,
25  you're not under arrest. So I went and sit in

1  that night?
2  A.  After he did that, I had got up off the ground
3  and he turn around and he looked at me and he
4  said "I'm looking for you". I said "for what".
5  He said "you under arrest". I said "for what".
6  He said "because you tried to hit me". I said
7  "when". I said "officer, I ain't tried to hit
8  you. I'm the one called you all out here, I'm
9  not trying to hit you. Those are my kids". I
10  tried to explain everything to him and it
11  didn't work. And I told -- and then he grabbed
12  me and then he slung my arms behind my back and
13  then he put the handcuffs on and I told him I
14  had a messed up shoulder (indicating) and that
15  my shoulders was messed up (indicating). He
16  snatched my arms and snatched 'em, pulled 'em
17  behind me and put the handcuffs on me real
18  tight, and then he told me to go sit on the
19  curb.
20  Q.  And did you go sit on the curb?
21  A.  Yes, I did. And by that time he told Audre to
22  move the van so Audre moved the van. So I sit
23  on the curb.
24  Q.  Where is Shannon?
25  A.  She's standing up there stunned. Everybody's

1  the car and the man told me I wasn't under
2  arrest.
3  Q.  And who is this?
4  A.  I don't know who he is.
5  Q.  Is it Officer Henry?
6  A.  No. It's another cop that pulled up and he
7  took me off the curb, sat me in the car. And
8  then the police that was in the car that was
9  asking me questions, and I said "well, am I
10  under arrest", I said "what am I under arrest
11  for". He said you're not under arrest. Then
12  he start asking me questions and I told him I
13  had just got up out my bed, I didn't know
14  nothing but I came out to stop my kids from out
15  there clowning.
16  Q.  And the clowning that you're talking about is
17  when Antron and Travis were wrestling so much
18  that they ended up with an injured lip for
19  Travis and blood all over; correct?
20      MR. THOMPSON: Objection, misstates
21      evidence.
22  BY MR. TOWNSLEY:
23  Q.  I'm sorry, ma'am, what did you say?
24  A.  Just the blood. The lip.
25  Q.  But that's what you meant by clowning, correct,

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

Page 81

1 when you told the officer that your boys had
2 just been clowning around.
3 A.  Yeah, clowning around.  Just a figure of
4 speech.
5 Q.  Whose gun was found there that night?
6 A.  I don't know anything about a gun.  I know my
7 kids didn't have no gun, and that's what the
8 officer was asking me in the car, what do you
9 know about a gun.  I said "man, I just got up
10 out of my bed.  I don't know anything about
11 nothing".
12 Q.  So you know there was a gun found that night;
13 correct?
14 A.  No, he asked me about a gun.  I ain't know
15 nothing about a gun.
16 Q.  Are you aware there was a gun found that night?
17 MR. THOMPSON: Objection, misstates
18 evidence.
19 A.  No.
20 BY MR. TOWNSLEY:
21 Q.  You're not aware there was a gun found there
22 that night.
23 A.  No.  All I know is they asked me about a gun.
24 Q.  As we sit here today, you're not aware if there
25 was a gun found that night on one of the cars

Page 82

1 right there.
2 A.  No, I do not know.  They told me.
3 Q.  Okay.  Now what about your arrest in
4 particular -- let me rephrase that.  You told
5 me you've been arrested one time before this
6 event; correct?
7 A.  Yes.
8 Q.  That was some years before June 6, 2010;
9 correct?
10 A.  Yes.
11 Q.  And is it your position today that something
12 that the police did in their arrest of you on
13 June 6th was in some way indecent or
14 humiliating?
15 A.  It was very humiliating for the police to be
16 laying on top of me and how he did it because
17 his whole body was on me, and then he wants to
18 arrest me.
19 Q.  And what you've said was that what offended you
20 about the arrest was that they didn't ask you
21 any questions and they wouldn't listen to you.
22 A.  They wouldn't listen to nobody.
23 Q.  Wouldn't listen to anybody.  They sat you on
24 the curb and you had to sit in the police car
25 and the policeman asked you questions.  How

Page 83

1 else has this arrest or this event been
2 humiliating or otherwise affected you
3 emotionally?
4 A.  After they -- after I sit in the car for about
5 15 minutes and they kept telling me I wasn't
6 under arrest, then they take me around the
7 corner back around to Piatt (indicating) and
8 Random to where Sergeant Henry was sitting
9 (indicating).  He was sitting around there when
10 the police took me around there.  And I said "I
11 thought you told me I wasn't under arrest".  He
12 said "you not but you got to get in the car
13 with Sergeant Henry".  So when I got in the car
14 with Sergeant Henry, he said "you under
15 arrest".  And I said "well, what did I do".  He
16 said "you tried to hit me".  I said "well, when
17 did I try to hit you".  I said "I ain't try to
18 hit you".  I said "my hands are messed up, I
19 didn't try to hit you".  I said "when did I try
20 to hit you".  He said "you tried to hit me back
21 there".  I said "I never tried to hit you".  So
22 then he said "well, you still under arrest,
23 you're under arrest".  And I was crying and he
24 said "shut up crying".  He said "why are you
25 crying".  I said "because you throwed me down

Page 84

1 on the ground and you hurt me".  He said "well,
2 you shouldn't have tried to hit me".  I said "I
3 never tried to hit you, sir".  So then he took
4 me on down to the place -- took me on down to
5 the station and there was another cop coming
6 out of the station and he rolled his window
7 down, he said "yeah, man, I got one, I just got
8 battered".  I said "no, no, you battered me".
9 He said "I just got battered, I got one".
10 Q.  So the police talking to each other while
11 they're taking you downtown is --
12 A.  No.  We were downtown.
13 Q.  This is once you're downtown?
14 A.  Yes.  We were sitting in the car.  A cop comes
15 out the door that he knows going to his car and
16 he rolled -- and Sergeant Henry rolled his
17 window down and told him that he got one, he
18 had just been battered.  And I told him "no,
19 you battered me" and he told me "shut up and
20 stop crying because it wasn't nothing but a
21 misdemeanor".
22 Q.  Mrs. Patterson, how else has this arrest
23 affected you emotionally?
24 A.  It's tore me up because then when we -- I was
25 having nightmares.  Had to go to the doctor.

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

Page 85

1  Q.   What doctor?
2  A.   I was at the Hunter Health when this happened.
3  Q.   And you went to them about nightmares?
4  A.   I went to them about my whole condition
5  (indicating).
6  Q.   You went to them about your physical injuries;
7  right?
8  A.   Yes.
9  Q.   Okay.  What did they do for you about
10 nightmares?
11 A.   They was telling me that -- well, I take
12 depression pills, too, so I take
13 antidepressants for all of the depression and
14 everything that I'm going through.
15 Q.   And you did that before June 6, 2010; correct?
16 A.   What?
17 Q.   Took pills for depression?
18 A.   Yes.
19 Q.   Had depression?
20 A.   Yeah.  Yes.
21 Q.   Experienced depression?
22 A.   Yes, and then it got worse.
23 Q.   Are you saying it got worse because you were
24 arrested?
25 A.   It got worse because I was physically harmed.

Page 86

1  Q.   So your depression got worse because of the
2  physical aspects of what you say happened to
3  you that night; correct?
4  A.   Yes.
5  Q.   Did your depression get worse because you were
6  emotionally upset about being arrested?
7  A.   It wasn't the arresting part.  It was
8  everything that happened.
9  Q.   It was the physical part of being --
10 A.   The physical, the every part of it that
11 happened that night.
12 Q.   Is there anything else you can add to your
13 answer to my question about how this arrest has
14 affected you emotionally or mentally?
15 A.   Yes.  And then when we got down to the booking
16 room, my son was already -- my son was -- he
17 was coming in, so they were already inside when
18 me and Sergeant Henry went in, and my son was
19 asking me how was I doing.  And he asked me
20 twice and Sergeant Henry told him to shut up
21 and turn around.  He said "I got a right to ask
22 my mama how she doing".  He put his pad and his
23 pencil down and he walked around all the people
24 that were in there and just started kicking my
25 son in his leg, kneeing him while three other

Page 87

1  officers is holding him.
2  Q.   You say he was kicking your son in his leg?
3  A.   Yes, kneeing him with his knee.
4  Q.   He was using his knee, and where was he
5  striking your son?
6  A.   In his thigh.
7  Q.   In his thigh?
8  A.   Uh-huh.
9  Q.   Have you ever had any training in police
10 tactics?
11 A.   Who?
12 Q.   You.
13 A.   No.
14 Q.   Have you ever had any training in methods of
15 control -- physical control of individuals?
16 A.   No.
17 Q.   Have you ever had any training in use of a
18 Taser?
19 A.   No.
20 Q.   Have you ever had any training in making an
21 arrest?
22 A.   No.
23 Q.   Have you ever had any training in crowd
24 control?
25 A.   No.

Page 88

1  Q.   Do you have any training in management of
2  physically active and/or violent individuals?
3  A.   No.
4  Q.   Do you have any experience with any of those --
5  A.   No.
6  Q.   -- things?  At that point, what happened with
7  your -- in the booking room?
8  A.   That's when he started kneeing him, and I just
9  started hollering "you all leave my son alone,
10 you all did enough to us tonight, leave us
11 alone".  So he took him away from around me and
12 I told him "leave my son alone".
13 Q.   Were there other officers assisting Officer
14 Henry?
15 A.   Yes, the three that were sitting there because
16 he was sitting there talking to one police and
17 he was not in handcuffs and he was just talking
18 to the police.
19 Q.   Did he stand up at some point?
20 A.   When Sergeant Henry walked around the counter,
21 when he walked around toward him.
22 Q.   And what did the other officers that were
23 dealing with Travis say to Travis?
24 A.   They just grabbed him.
25 Q.   Did the officer that was booking Travis tell

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

Page 89

1 him to sit down?
2 A. No.
3 Q. Did the officer that was booking Travis tell
4 him to be calm?
5 A. No.
6 Q. Did the officer booking Travis tell him that he
7 needed to comply with officers' orders?
8 A. No.
9 Q. Did anyone say anything at all to Travis?
10 A. Ain't nobody said nothing.
11 Q. Just Officer Henry walked up and started --
12 A. My son was asking me how was I doing from the
13 incident, and I told him and before I could
14 answer he told him to shut up and turn around.
15 Q. Okay. So the officer -- you heard the officer
16 tell --
17 A. Yes.
18 Q. -- travis to --
19 A. Shut up and turn around.
20 Q. -- shut up and turn around? Did Travis shut up
21 and turn around?
22 A. He said "I got a right to ask my mama how she
23 doing".
24 Q. So he did not shut up and turn around, did he?
25 A. No.

Page 90

1 Q. Is there any other aspect of the events that
2 night that you want to tell me about?
3   MR. THOMPSON: Objection, vague.
4   BY MR. TOWNSLEY:
5 Q. You can answer.
6 A. Besides what all he did to us. They booked me.
7 I asked 'em if I could see a doctor. They told
8 me no, that I would have to wait until I get
9 out. That was humiliating. I had on my
10 nightclothes, I didn't have no shoes on. I had
11 a bag on my head and they wouldn't give me a
12 pair of shoes. They came in with a pair of
13 shoes and it was time for me to get out. Told
14 me I couldn't see a doctor and that I would
15 have to see one when I get out.
16 Q. What type of bag did you have on your head?
17 A. A hair bag.
18 Q. That's one you put on; correct?
19 A. Yes.
20 Q. And how long were you in the booking process?
21 How long did that take?
22 A. About 45 minutes, I guess. About 45 minutes.
23 Q. Other than not, as you say, throwing you to the
24 ground, having you sit in the police car,
25 having to answer questions to police officers

Page 91

1 and being booked while you're in your
2 nightclothes, what could the officers have done
3 to arrest you that would not have left you, as
4 you say, humiliated?
5 A. If they had came around and did it the way they
6 was supposed to.
7 Q. How is it you think they're supposed to?
8 A. They supposed to come and ask questions, see
9 what's going on, see what happened.
10 Q. What happened with your arrest?
11   MR. THOMPSON: Objection, vague.
12   BY MR. TOWNSLEY:
13 Q. I'm sorry. Were you prosecuted for a crime
14 after you were arrested?
15 A. They told me a TO.
16 Q. What is that? That you were prosecuted for a
17 TO?
18 A. Uh-huh. Yes.
19 Q. Did anybody ever say battery on a law
20 enforcement officer?
21 A. After I asked 'em what it was.
22 Q. And what happened with that charge?
23 A. They dropped it. I was found not guilty.
24 Q. So you went to municipal court?
25 A. Yes.

Page 92

1 Q. Did you testify?
2 A. No.
3 Q. You did not testify?
4 A. No.
5 Q. Did you have an attorney?
6 A. Yes.
7 Q. Who was the attorney?
8 A. He was a court-appointed.
9 Q. Did you testify under oath in municipal court
10 that you swatted away a flashlight that was in
11 your eyes?
12   MR. THOMPSON: Objection,
13 misstates --
14 A. No.
15   MR. THOMPSON: -- misstates
16 evidence and asked and answered.
17   MR. TOWNSLEY: I've not asked that
18 before.
19   MR. THOMPSON: You asked if she
20 testified. She said no.
21   MR. TOWNSLEY: I just asked if she
22 testified -- okay. Not going to argue
23 with you. Do we have an answer to the
24 question?
25   COURT REPORTER: She said "no".

---

Page 97

1 him after the -- after I found out who he was
2 and that he had witnessed everything.
3 Q. Okay. So this is in 2010; correct?
4 A. Uh-huh. Yes.
5 Q. And have you spoken with Mr. Shahid in 2013?
6 A. I've talked to him.
7 Q. Have you spoken with Mr. Shahid in 2012?
8 A. A time, yeah. Yes.
9 Q. And have you spoken with Mr. Shahid in 2011?
10 A. Yes.
11 Q. And it's your understanding that he intends to
12 testify as a witness in this lawsuit; is that
13 correct?
14 A. Yes.
15 Q. Okay.
16     MR. TOWNSLEY: This would probably
17     be a pretty good point to break and have
18     lunch. Let's go off the record.
19     (A lunch recess was taken.)
20     BY MR. TOWNSLEY:
21 Q. Mrs. Patterson, before we get into the main
22 subject for the afternoon, I want to ask you a
23 couple follow-up questions. I didn't ask you
24 about Antron and Travis' father. Is he in
25 town?

---

Page 98

1 A. No.
2 Q. Is he alive?
3 A. Yes.
4 Q. Is it the same person for both?
5 A. Yes.
6 Q. Where is he?
7 A. Denver.
8 Q. And what's his name?
9 A. Vince.
10 Q. Vince?
11 A. Uh-huh.
12 Q. And first name?
13 A. Vince.
14 Q. Last name?
15 A. Cox.
16 Q. When you went in -- let me ask you this.
17 After this incident on June 6, 2010, did your
18 medication or treatments for depression change
19 from what they were before?
20 A. Yes.
21 Q. How so?
22 A. I was on like ten -- they had me on
23 10 milligrams and they raised it to 30.
24 Q. And that's Hunter Health Clinic?
25 A. No. That's Comcare.

---

Page 99

1 Q. Comcare. Okay. And where do you get your
2 prescriptions filled?
3 A. At Dillons.
4 Q. Which Dillons?
5 A. On Douglas and Hillside.
6 Q. And was that true in 2010 also?
7 A. Yes.
8 Q. And what was it that went from 10 to
9 30 milligrams?
10 A. My Lexapro.
11 Q. And what is the lighting like on your block? I
12 didn't ask you that earlier. Do you have
13 street lights?
14 A. Yes, I have a street light.
15 Q. Is it pretty good right around your house or --
16 A. Yes.
17 Q. So when people arrived at 1:00 in the morning,
18 it was possible to tell who was who?
19     MR. THOMPSON: Objection, calls for
20     speculation.
21     BY MR. TOWNSLEY:
22 Q. On June 6, 2010 when officers arrived at 1:00
23 in the morning, was it possible to see clearly
24 that they were in uniform?
25 A. Yes.

---

Page 100

1 Q. Was it possible to see clearly who was standing
2 where?
3 A. No.
4 Q. Why not?
5 A. Because I don't know 'em.
6 Q. Okay. Was it possible to see clearly where
7 individuals were standing whoever they are?
8 A. Yes.
9 Q. Mrs. Patterson, what do you do for fun?
10 A. Nothing any more.
11 Q. What did you used to do?
12 A. I used to play coed volleyball.
13 Q. When was that?
14 A. 2006, 2005.
15 Q. And where did you play volleyball?
16 A. I played at St. Mark's.
17 Q. Is that a church league?
18 A. Yes.
19 Q. Do you attend church regularly?
20 A. Yes.
21 Q. Did you attend church regularly before this
22 event?
23 A. Yes.
24 Q. Did you attend church regularly after this
25 event?

Mary Patterson, et al. v
City of Wichita, Kansas, et al.

MARY PATTERSON
February 12, 2013

Page 101

1  A.  No.
2  Q.  Why not?
3  A.  Because I wouldn't feel like -- wouldn't feel
4  like going or something be hurtin' or I just
5  didn't feel good.
6  Q.  Is that physical reasons or mental reasons?
7  A.  Physical.
8  Q.  Are there other ways that your life has changed
9  since this event?
10  A.  Yes.
11  Q.  How so?
12  A.  I can't do none of the things that I used to
13  do.  I used to walk up on 13th.
14  Q.  You used to walk you say?
15  A.  Yes.
16  Q.  And now you don't?
17  A.  No.
18  Q.  When did you stop?
19  A.  After all this happened.
20  Q.  How far would you walk on 13th?
21  A.  It would be so many miles.
22  Q.  How many is so many?
23  A.  I'm not sure.
24  Q.  Where would you go?
25  A.  On 13th and Oliver.

Page 102

1  Q.  You would go to 13th and Oliver and back?
2  A.  No.  They got a -- you can walk -- they got
3  a -- you know, you got certain stations where
4  you could stop, do the exercises, and then they
5  got a mile like walk area right on 13th and
6  Oliver across from that one church.  I forget
7  the name of it.
8  Q.  There's a park there, isn't there?
9  A.  Yes.
10  Q.  It's in that park?
11  A.  Yes.  And it's got where you can walk, go to
12  the certain stations and do the exercises,
13  stuff like that.
14  Q.  And you would do that right up to June 6, 2010?
15  A.  Yes.  I was walking, dancing, everything.
16  Q.  Where do you go dancing?
17  A.  Club.
18  Q.  Anywhere in particular?
19  A.  The Legion.
20  Q.  And since June 6, 2010 you don't go dancing;
21  correct?
22  A.  No.  I don't go out any more.
23  Q.  Is that for the same reasons because you
24  physically hurt?
25  A.  Yes.

Page 103

1  Q.  Any other reason?
2  A.  And mentally.
3  Q.  Okay.  Tell me about that.
4  A.  I get kind of paranoid around a lot of people
5  or a big crowd.  I done got to the point I
6  don't want to be bothered with anybody.
7  Q.  How does the paranoia manifest itself for you
8  when you're around people?
9  A.  Get like anxiety like a scared feeling.
10  Q.  And did you ever have that before 2010?
11  A.  Yeah, some.  Not as bad.
12  Q.  Do you tell your friends about what happened on
13  June 6, 2010?
14  A.  My family.
15  Q.  You do talk to family about it?
16  A.  Yes.
17  Q.  You don't talk with friends about it; is that
18  correct?
19  A.  Right.
20  Q.  Why not?
21  A.  Because I don't like anybody in my business.
22  Q.  Is that just a general statement is that true
23  or does it only apply to this event?
24  A.  I don't talk to nobody about my business.
25  Q.  If you wanted to talk to friends about this,

Page 104

1  you could; correct?
2  A.  Yes.
3  Q.  Have you told anybody at your new workplace
4  about this event?
5  A.  No.
6  Q.  And part of that's because you don't like to
7  talk to people about your business; correct?
8  A.  Yes.
9  Q.  Are there other reasons you haven't talked
10  about this to the people at your new workplace?
11  A.  The new workplace I have I work with a dyslexic
12  child.  I don't work around nobody.
13  Q.  We talked about this event this morning.  We
14  talked about from the time the police
15  arrived -- at the point the police arrived,
16  they're shouting, they're flashing flashlights
17  until you end up on the curb and you're
18  handcuffed and you've been sat down, how much
19  time do you think passed?
20  A.  About 15, 20 minutes.
21  Q.  And that's how long it took to get Antron under
22  control and Tase Travis and get you to the
23  curb; is that correct?
24  A.  All of that happened before he sit me on the
25  curb.

Page 153

1  St. Francis.
2  Q.  Did you used to sew a lot?
3  A.  **Yes. I did upholstery.**
4  Q.  Did you quit doing that in 2007 after your car
5  accident?
6  A.  **Yes.**
7  Q.  Do you wake up in the night from pain?
8  A.  **Yes.**
9  Q.  How frequently?
10  A.  **Every night.**
11  Q.  Where is the pain?
12  A.  **It be on my left side because sometimes I'll**
13  **wake up and I'll be on my left side and that**
14  **will wake me up.**
15  Q.  You've had some steroid injections; is that
16  right?
17  A.  **Yes.**
18  Q.  Who has done that work for you?
19  A.  **Hunter Health.**
20  Q.  Hunter Health Clinic?
21  A.  **Yes.**
22  Q.  And where were those shots?
23  A.  **In my neck.**
24  Q.  In your neck. Okay.
25  A.  **In my shoulder and neck (indicating).**

Page 154

1  Q.  And who has diagnosed a or has someone
2  diagnosed a rotator cuff issue?
3  A.  **On this arm (indicating).**
4  Q.  That's on your right shoulder?
5  A.  **Uh-huh.**
6  Q.  You don't have a rotator cuff issue with your
7  left shoulder; is that correct?
8  A.  **Yes, I do.**
9  Q.  Has someone diagnosed that?
10  A.  **Well, they said it was a rotator cuff and it**
11  **was a ligament or something.**
12  Q.  Okay. Can you tell me what hospital or what
13  physician gave you that diagnosis?
14  A.  **Via Christi.**
15  Q.  Via Christi?
16  A.  **Uh-huh.**
17  Q.  You said earlier that when the police came on
18  June 6, 2010 you were aware that Antron was
19  wanted and you were aware of what he was wanted
20  for. Can you tell me if he was prosecuted
21  after he was arrested on June 6?
22  A.  **I don't know.**
23  Q.  Was he convicted of what he was wanted for?
24  A.  **No. No.**
25  Q.  Was he acquitted? Was he prosecuted at all, do

Page 155

1  you know?
2  A.  **He's in jail.**
3  Q.  Is he in jail on the charges that were pending
4  on June 6, 2010?
5  A.  **Are you talking about prior?**
6  Q.  He was wanted that night when the police came;
7  correct?
8  A.  **Okay. Yeah. Yes.**
9  Q.  That's what you've testified earlier that you
10  were aware of that. What I'm asking is was he
11  prosecuted for those same charges and what
12  you've said is that he's in jail. So my
13  question is was is he in jail for those charges
14  that he was wanted for that night?
15      MR. THOMPSON: Objection to the
16  extent it calls for a legal conclusion.
17      BY MR. TOWNSLEY:
18  Q.  Okay. Do you know what he's in jail for?
19  A.  **Do I know now, yes.**
20  Q.  Okay. What's he in jail for?
21  A.  **Supposed to be pulling a girl back in a room**
22  **two or three times, but that's what he wasn't**
23  **charged for when they got him for that.**
24  Q.  Those were the charges that were pending when
25  they came; correct? You remember you testified

Page 156

1  that he wanted to leave because he had warrants
2  on him; correct?
3  A.  **I never told you that.**
4  Q.  I think you did. I think we've talked about
5  that today.
6      MR. THOMPSON: I don't think that
7  was her testimony, though.
8      BY MR. TOWNSLEY:
9  Q.  Okay. What the testimony was is you were aware
10  that he was wanted that night.
11  A.  **I knew they was wanting to arrest him, yes.**
12  Q.  Is he in jail for the things they wanted to
13  arrest him for on June 6th and before? I mean
14  he was wanted that night; correct?
15  A.  **Yes.**
16  Q.  I'm not trying to confuse you. I'm sorry. I
17  think we're confusing -- I think I'm confusing
18  you. He's in jail now.
19  A.  **Yes.**
20  Q.  What he is in jail for is what he was wanted
21  for that night. Is that correct or is it
22  something different?
23  A.  **Something different.**
24  Q.  Okay. Do you know what happened with the
25  charges that he was wanted for that night? Do

Page 157

1  you know?
2  **A.  It was supposed to have been a rape charge.**
3  Q.  Is that what he's in jail for now?
4  **A.  No.**
5  Q.  Okay.
6  **MR. THOMPSON:** Chan, would you like
7  me to give you our understanding of that?
8  **MR. TOWNSLEY:** Sure.
9  **MR. THOMPSON:** Our understanding
10  because we had a discussion about this
11  was they wanted him on a rape charge, but
12  since then it's been amended to a
13  kidnapping charge and they dropped the
14  rape charge was her understanding of it,
15  or at least that's my understanding of
16  the way things kind of fell down on that.
17  **MR. TOWNSLEY:** Okay.  Let's go off
18  the record for a minute.
19  (A brief recess was taken.)
20  **BY MR. TOWNSLEY:**
21  Q.  Mrs. Patterson, I know you have made a
22  complaint to the police about this event.  Is
23  that correct?
24  **A.  Yes.**
25  Q.  And I've seen some pictures.  When were

Page 158

1  pictures taken of your foot and your arm?  Were
2  they taken that night?
3  **A.  That morning.**
4  Q.  The officers took pictures that morning.  Is it
5  before they took you down to booking or after?
6  **A.  No, that was after.  It was later on that**
7  **morning.**
8  Q.  I'm going to show you a picture.  Is this a
9  picture of you?
10  **A.  Yes.**
11  Q.  Where is that picture taken?
12  **A.  My house.**
13  Q.  That's at your house?  Is that later in the day
14  on June 6, 2010?
15  **A.  Later that morning.**
16  Q.  This is after you've been to Galichia Hospital
17  and back?
18  **A.  Yes.**
19  Q.  Who took this photograph?
20  **A.  Hoofer.**
21  Q.  Is this a police officer?
22  **A.  Yes.**
23  Q.  Judith Martin -- or Judith Jones I mean?
24  **A.  Yes.**
25  Q.  So Judith Jones came out to your house?

Page 159

1  **A.  Yes.**
2  Q.  What do you remember about her coming to your
3  house?
4  **A.  Said she had got a call that she had needed to**
5  **come out to my house and to get my complaint.**
6  Q.  And so she came out and visited with you?
7  **A.  Yes.**
8  Q.  And did she take your complaint?
9  **A.  Yes.**
10  Q.  Did you tell her your complaint at the time?
11  **A.  Yes.**
12  Q.  Told her everything about it?
13  **A.  I told her everything I could tell her about**
14  **it.**
15  Q.  And she took these pictures -- or she took that
16  picture?
17  **A.  Yes.**
18  Q.  Are you dressed differently than you were when
19  you were taken to jail?
20  **A.  Yes.**
21  Q.  I'm going to show you another picture.  Is this
22  a picture of your left foot --
23  **A.  Yes.**
24  Q.  -- taken by Officer Jones on June 6, 2010?
25  **A.  Yes.**

Page 160

1  Q.  So that shows your foot within hours of the
2  injury; correct?
3  **A.  Yes.**
4  Q.  Okay.  Where is this picture taken with your
5  foot on a blue pillow?
6  **A.  That's still my house.**
7  Q.  That's still your house?
8  **A.  Uh-huh.**
9  Q.  Is that taken at a different time?
10  **A.  It's taken about the same time.**
11  Q.  Is that a picture you took or did Officer Jones
12  take that?
13  **A.  No, she only took these pictures (indicating).**
14  **These are from my camera (indicating).**
15  Q.  Is that the same picture or different?
16  **A.  Yes, same picture.**
17  **MR. TOWNSLEY:** Let's go off the
18  record for a minute.
19  (Discussion held off the record.)
20  (Marked for identification
21  Deposition Exhibit Number 4.)
22  **BY MR. TOWNSLEY:**
23  Q.  Mrs. Patterson, I have put some pictures in
24  front of and I am marking one group of
25  photographs as Exhibit 4.  Ask you to take a