# EXHIBIT 3

# In The Matter Of:

*Mary Patterson, et al. v*
*City of Wichita, Kansas, et al.*

## TRAVIS PATTERSON
## February 14, 2013

**Court Reporting Service, Inc**
River Park Place - 727 N. Waco, Suite 360
Wichita, KS 67203    (316) 267-1201
www.crsreporting.com

*Original File JL4467.txt*
Min-U-Script® with Word Index

**Page 1**

```
 1         IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF KANSAS
 2
 3   MARY PATTERSON, Individually,    )
     and TRAVIS PATTERSON,            )
 4   Individually,                    )
                                      )
 5                        Plaintiffs, )
                                      )
 6            vs.                     ) Case No.
                                      ) 12 CV 1308-JAR-KGG
 7   CITY OF WICHITA, KANSAS, and     )
     OFFICER J. HENRY,                )
 8                                    )
                          Defendants. )
 9   _____)
10
11
12         Deposition of TRAVIS PATTERSON, taken by
13   the Defendants, City of Wichita, Kansas, and
14   Officer J. Henry, before me, Janelle E. Lindeman, a
15   Certified Shorthand Reporter within and for the
16   State of Kansas, at 301 North Main, Suite 1600,
17   Wichita, Sedgwick County, Kansas, commencing at
18   9:34 a.m. on the 14th day of February, 2013.
19
20              A P P E A R A N C E S
21         Plaintiffs, Mary Patterson and Travis
22   Patterson, appear in persona and by their attorney,
23   James A. Thompson, Klenda Austerman, L.L.C., 301
24   North Main, Suite 1600, Wichita, Kansas 67202.
25
```

**Page 2**

```
 1         A P P E A R A N C E S  (cont.)
 2         Defendants, City of Wichita, Kansas and
 3   Officer J. Henry, appear by their attorney, Chan P.
 4   Townsley, Assistant City Attorney, 455 North Main,
 5   13th Floor, Wichita, Kansas 67202.
```

**Page 3**

```
 1                INDEX OF EXAMINATION
 2   TRAVIS PATTERSON
 3                   DIRECT   CROSS   REDIRECT
 4   by Mr. Townsley........4..............120
 5   by Mr. Thompson...............115
 6
 7                INDEX OF EXHIBITS
 8   EXHIBIT                                   MARKED
 9   Number 6..................................23
        Aerial photo
10   Number 7..................................26
        Aerial photo
11   Number 8..................................76
        Main Booking, Booking Report
12   Number 9..................................78
        Journal Entry-Misdemeanor Case
13   Number 10.................................79
        Court case document
14   Number 11.................................81
        Uniform Criminal Complaint/Notice to
15      Appear
     Number 12.................................88
16      Uniform Criminal Complaint/Notice to
        Appear
17   Number 13................................103
        Color copy of photo
18   Number 14................................104
        Color copy of photo
19   Number 15................................106
        WPD physical evidence form
20   Number 16................................106
        Criminal Investigation Record
21
22   SIGNATURE OF WITNESS.....................122
23   CERTIFICATE OF REPORTER..................123
```

**Page 4**

```
 1   TRAVIS PATTERSON,
 2   having been first duly sworn, was
 3   examined and testified as follows:
 4
 5   DIRECT EXAMINATION
 6   BY MR. TOWNSLEY:
 7   Q. Mr. Patterson, my name is Chan Townsley. I'm
 8   an Assistant City Attorney for the City of
 9   Wichita. We're here today on the lawsuit
10   that's been filed by you and your mother
11   against the City. The purpose of a deposition
12   is my opportunity to ask you questions and get
13   answers under oath to find out -- and it's my
14   only opportunity to find out what you are
15   alleging happened on June 6, 2010. For
16   purposes of this deposition, I'm going to ask
17   you questions and the court reporter is going
18   to write down the answers and it's important
19   that when I ask you a question that you answer
20   verbally.
21   A. Okay.
22   Q. And also, when I ask a question with a yes --
23   if you want to answer yes or no, that you use a
24   yes or a no because when we write down uh-huh
25   and huh-uhs or nods of the heads or shakes of
```

**Page 13**

1  A.  Either playing basketball or being home with my
2  kids.
3  Q.  Were there occasions in 2010 when you would go
4  drinking?
5  A.  Yes.
6  Q.  Were there occasions when you would go drinking
7  with your brother?
8  A.  Rarely.
9  Q.  Is your brother Antron Cox?
10 A.  Yes.
11 Q.  And in June of 2010, where did he live?  Do you
12 know?
13 A.  He lived from house to house but it was like
14 with -- it was with Shannon Phares.
15 Q.  Did he stay at occasions at your mother's house
16 on Random Road?
17 A.  Yes.  Rarely.
18 Q.  And what kind of places would you go if you
19 went out to have drinks with your brother?
20 A.  That was the first time in a long time, so...
21 Q.  You're saying June 6 was the first time in a
22 long time?
23 A.  Yes.
24 Q.  Where did you go on June 6, 2010 with your
25 brother?

**Page 14**

1  A.  To Mojoe's Bar & Grill.
2  Q.  Where is that?
3  A.  Harry and Greenwich.
4  Q.  What time did you go out?
5  A.  About 10.
6  Q.  Did you go to any other places that evening?
7  A.  Didn't get a chance to.
8  Q.  You weren't in Old Town at all?
9  A.  I was.  We was in a parking lot and we were
10 about to go, but he wanted me to take him home.
11 Q.  You were in the parking lot at Mojoe's and were
12 going to go to Old Town?
13 A.  Yes -- no.  No.  We was in the parking lot at
14 Mojoe's -- we went into Mojoe's, had a few
15 drinks, then we went downtown.
16 Q.  So you had been at Mojoe's and then to
17 downtown?
18 A.  Yes.
19 Q.  Like Old Town?
20 A.  Yes.
21 Q.  Club Liquid maybe?
22 A.  We didn't go in any club.  No club downtown.
23 Q.  You got down to the parking lot.
24 A.  Yes.
25 Q.  So you got to Old Town parking lot of some

**Page 15**

1  establishment --
2  A.  It was behind that parking garage.
3  Q.  And where were you going to go?
4  A.  It was about -- I think either Doc's or Club
5  Liquid, but we was walking to Club Liquid.
6  Q.  How long were you at Mojoe's?
7  A.  About 45 minutes.
8  Q.  And did Antron have much to drink?
9  A.  About two and a half drinks.
10 Q.  How about yourself?
11 A.  I had two and a half.
12 Q.  What were you guys drinking?
13 A.  I remember I drunk rum and Coke.  I'm not sure
14 what he drunk.
15 Q.  So you get down to the parking lot in Old Town
16 and -- well, let me just ask you this.  You
17 said you hadn't been out with Antron for some
18 time?
19 A.  Yes.
20 Q.  Why is that?
21 A.  He was never really -- I never really -- he was
22 never really around for me to ask him.  Like
23 not really around for us to -- we never really
24 hung out.
25 Q.  Is he a little bit older?

**Page 16**

1  A.  Yeah.
2  Q.  How many years?
3  A.  I believe he's 31 right now, so about five.
4  Q.  Five or six years older then, somewhere in
5  there?
6  A.  Yeah.
7  Q.  Does he tend to run with a little bit different
8  crowd?
9  A.  Yes.
10 Q.  On that night then when you're in the parking
11 lot, is Antron upset?
12 A.  Yes.
13 Q.  Is he in an angry mood or what?  What's going
14 on?
15 A.  He was up -- you want me to explain?
16 Q.  Yes, please.
17 A.  He was upset about a conversation we had
18 earlier about one of our cousins about how
19 she's -- basically was talking about how she's
20 selfish and just don't care about nobody but
21 herself, and he didn't believe that, so...
22 Q.  So that was your opinion that you had
23 expressed?
24 A.  Yes.
25 Q.  He disagreed with you?

**Page 45**

1 (indicating) like toward the ends of the --
2 Q. But she had been at the end of the driveway at
3 some point and then she came over to -- just
4 put a circle where you think your mother was.
5 A. (Witness complies.) Because I remember her
6 like kind of bending over. She didn't want to
7 get all the way over. She was bending over
8 telling him to stop, he didn't do nothing,
9 Twan, don't fight 'em.
10 Q. So she's saying "Antron, don't fight"?
11 A. Basically don't resist arrest, don't try to --
12 yeah, basically don't try to fight 'em.
13 Q. And is she saying anything to the officers like
14 "stop, let him up"?
15 A. "Stop, he didn't do nothing". I don't recall
16 what else was said.
17 Q. Other things were said that you don't remember.
18 A. No.
19 Q. Happening pretty fast?
20 A. Yes.
21 Q. Things moving pretty quickly as this is going
22 on?
23 A. Yes. You could say so, yes.
24 Q. Do you hear any officers say anything to your
25 mother?

**Page 46**

1 A. Yes.
2 Q. What do they say?
3 A. "Back up".
4 Q. Do they say it a couple times?
5 A. I'm not sure.
6 Q. Maybe once, maybe more? Don't remember?
7 A. Yeah, don't remember. All I heard was "get the
8 fuck back". I heard "get the fuck back" twice.
9 Q. And I appreciate we normally don't want to
10 throw these words around, but we're in a
11 deposition and we're talking about what
12 happened that night, so I appreciate we just
13 want to be direct with it.
14 A. Yes.
15 Q. Not something I like to do on the record either
16 and I appreciate you don't. I can tell you
17 don't want to either, but if that's what they
18 said, that's what we want to talk about.
19 A. Okay.
20 Q. So you hear "get the fuck back" twice. Did you
21 see how your mother reacted to that, what she
22 did?
23    MR. THOMPSON: Object to the form
24 of the question.
25

**Page 47**

1    BY MR. TOWNSLEY:
2 Q. Did you see what your mother did when she was
3 told to get back?
4 A. No.
5 Q. You're still somewhere along the edge of the
6 street; correct?
7 A. Yes.
8 Q. Officers ran up with a bunch of flashlights;
9 right? Lights were flashing all over?
10 A. Yes.
11 Q. Were there any cars in the street, police cars?
12 A. They came like seconds later because they was
13 all -- they was all parked down the street as
14 Shannon said and later there was a car parked
15 in front of this house (indicating).
16 Q. Did they come up -- and you're pointing to the
17 house across the street and just to the south.
18 A. Yes.
19    MR. THOMPSON: On Exhibit 6.
20    BY MR. TOWNSLEY:
21 Q. On Exhibit 6. Did they pull up with -- the car
22 you're talking about, did it have red lights
23 flashing or did it just pull up at some point?
24 And all of these questions are if you remember,
25 of course. I don't want you to tell me if you

**Page 48**

1 don't remember.
2 A. No, I'm thinking. No, there wasn't no lights
3 flashing when they pulled up.
4 Q. Did you hear any officer tell your mother she
5 was under arrest at this point?
6 A. No.
7 Q. At this point, and it may not surprise you, but
8 the officer is going to say that he arrested
9 your mother and had to take her to the ground.
10 Now, what do you see?
11 A. I see -- standing on the curb I see officer
12 comes, basically tackles her. Like I remember
13 seeing he basically had his hand right here
14 (indicating) and I'm not sure if he like
15 basically picked her up and slammed her, but he
16 tackled -- it was like a tackle and then I saw
17 him like kind of hovering over her.
18 Q. When you said arm on chest, because this is a
19 transcript it's kind of hard to see, but what
20 you indicated was sort of a straight arm out,
21 sort of a stiff arm?
22    MR. THOMPSON: Objection.
23    BY MR. TOWNSLEY:
24 Q. How would you describe the arm?
25 A. It wasn't a stiff arm. It was like he was

Page 49

1  closer when he had his arm on her chest. It
2  was like --
3  Q. When I said stiff arm, I had my arm out
4  straight and that meant a couple feet apart,
5  and you're saying that's not correct; right?
6  A. No. It was more like he kind of like
7  bear-hugged her and slammed her (indicating).
8  Like a bear hug (indicating).
9  Q. I'm trying to understand what you meant when
10  you said arm on her chest. Can you describe it
11  any better?
12    MR. THOMPSON: Do you mind if he
13    uses me?
14  A. It was kind of something like this (indicating)
15  and he picked her up while he was doing it.
16  Something like that.
17    BY MR. TOWNSLEY:
18  Q. Well, standing up, what you're indicating is
19  one arm -- you're indicating two people that
20  are pretty close together facing each other --
21  A. Yes.
22  Q. -- right arm on the chest/neck area and you're
23  indicating a left arm that kind of came around
24  to the small of her back.
25  A. Yes.

Page 50

1  Q. That's roughly what you recall?
2  A. Yes.
3  Q. She seemed to lift up and then go down to the
4  ground?
5  A. No. She was down on the ground after that.
6  Q. Well, you said he kind of grabbed her like a
7  bear hug and almost lifted her up and went down
8  to the ground.
9  A. It's like how I grabbed him but he like lifted
10  her up in that sort of way and slammed her
11  (indicating).
12  Q. Could he have had the arm that was behind her
13  back as you were looking, could he have been
14  holding one of her wrists or both of her
15  wrists?
16  A. I didn't see that. I'm not sure.
17  Q. Maybe, maybe not?
18  A. Maybe. All I seen was her body go --
19  Q. Did she go down face first or do you know?
20  A. Back, side -- kind of like the side of her --
21  like she landed on this side (indicating).
22  Q. On her left side?
23  A. Yes. And it was like -- yeah, like she landed
24  on her left side.
25  Q. Where is Shannon now?

Page 51

1  A. Like right there standing.
2  Q. So both Shannon and your mom were --
3  A. Shannon, my mom and Audre was out in the middle
4  of the street at that point in time.
5  Q. So at the point where the officers are taking
6  Antron into custody on the grass or over in
7  that yard, not only has your mother moved to
8  where the circle is on Exhibit 6 by Shannon's
9  vehicle, but Shannon and Audre are also there?
10  A. Yes.
11  Q. So all three women are there.
12  A. Uh-huh. Yes.
13  Q. And they're still there at the point where the
14  officer has taken your mother to the ground?
15  A. Yes.
16  Q. So they haven't backed up, have they?
17  A. No.
18  Q. You see the officer take your mother to the
19  ground and is hovering over her, or that's the
20  way it appears to you; correct?
21  A. Yes.
22  Q. You know it's an officer; right?
23  A. Yes.
24  Q. He's in uniform; correct?
25  A. Yes.

Page 52

1  Q. What do you do?
2  A. After I saw her get tackled, I start walking
3  over there and I'm attempting to walk over
4  there. Not sure if I made it because like me
5  attempting to walk over there, I believe --
6  like I walked over there and all I remember is
7  getting tased after that so...
8  Q. So I just want to be real clear on what you
9  remember. You saw the officer -- you saw the
10  officer over your mother on the ground. You
11  start walking towards your mother?
12  A. Yes.
13  Q. And then the next thing you remember is you're
14  tased?
15  A. Yes.
16  Q. Is that correct?
17  A. I believe I lifted him up and raised my hands
18  after that like seconds after that and just
19  remember getting tased. Lifted him up off of
20  her and put my hands up.
21  Q. Now your recollection of this is not real clear
22  and I just want to ask if alcohol is part of
23  the reason that you don't have a clear
24  recollection.
25  A. No.

Page 53

1 Q. You don't think so. Alcohol didn't have
2 anything to do with it.
3 A. No.
4 Q. You remember walking towards the officer and
5 then being tased and, I'm sorry, you said had
6 your hands up you think?
7 A. I remember I walked towards the officer to
8 basically help -- basically get him off of my
9 mother.
10 Q. Your intent was to get the officer off of your
11 mother; correct?
12 A. Yes.
13 Q. Go ahead.
14 A. And after doing that, I put my hands up saying
15 "why are you all doing this, you all shouldn't
16 be doing this". And then while I'm having my
17 hands up asking them why are they doing this,
18 that's when I got tased twice.
19 Q. And you've talked about this event with your
20 family members since June 6, 2010, haven't you?
21 A. Like whenever it came up like me going to the
22 lawyer's office so no, not really. Like I try
23 to forget about it.
24 Q. What makes you think you got tased twice?
25 A. Because I didn't fall the first time, and while

Page 54

1 I was getting tased, I was looking -- my
2 girlfriend had made it back around to the curb
3 like standing in the yard and I was looking at
4 her and she saw a blank stare in my face, and I
5 didn't fall the first time and that's why they
6 did it again.
7 Q. So while you're being tased -- let me just ask
8 you. On Exhibit 6, are you being tased
9 somewhere between the circle that's near the
10 van which is where the three women were and
11 where you were before on the driveway, are you
12 being tased somewhere in that area in the
13 street?
14 A. Yes, I was being tased right there
15 (indicating).
16 Q. Put an X through that one.
17 A. (Witness complies.)
18 Q. And at this point, Audre is over on the curb by
19 the cars; right?
20 A. She's about right there (indicating).
21 Q. Have you seen any other neighbors or any other
22 people out other than yourselves, family
23 members and police at this time?
24 A. All I see is police and -- all I see is police
25 and my girlfriend and everybody else I

Page 55

1 didn't --
2 Q. Can you describe for me what you saw or heard
3 when you were tased, as you said, the first
4 time?
5 A. What the police were saying?
6 Q. Well, anything you remember from it.
7 A. After being tased, I fell to the ground on this
8 side (indicating), hit my jaw right here
9 (indicating) like this side of my face and I
10 remember the police lifting me up with
11 handcuffs and I remember me asking "why are you
12 all doing this? I'm going to school for this
13 type of stuff, I got an associate's degree" and
14 the officer said "your degree ain't like
15 mine's". One of the officers say "your degree
16 ain't like mine's". I said "why is that". He
17 said "because of where you live". And then I
18 said "wow" basically thinking in my head I
19 can't believe he said that. So then they
20 walked me over to the back of the police car,
21 sat me in, didn't shut the door quite yet,
22 asked me questions, asking me how your lip got
23 bloodied and --
24 Q. Do you remember what you told them about that?
25 A. Yes.

Page 56

1 Q. What did you tell them?
2 A. I said my brother hit me.
3 Q. Go ahead.
4 A. And I knew one of the officers because I went
5 to Friends with him, but I don't think he
6 remember me but I knew one of the officers.
7 I'm asking him "why are you all doing this, why
8 am I under arrest". I remember them saying
9 "you're not under arrest. I just want you to
10 sit down and relax for a second".
11 Q. Do you remember the name of the officer that
12 you went to school with?
13 A. It was Irving. That's what I was calling him
14 that night was Irving. I'm not for sure if
15 that was the right name or not.
16 Q. And he made a comment back that your degree was
17 different because you --
18 A. No, that was a different officer. That was
19 when they was walking me towards the police
20 car.
21 Q. That's not the officer you're talking to in the
22 police car.
23 A. No.
24 Q. But the comment was something -- what was the
25 comment again that your degree was different

Page 57

1  because --
2  A. **Of where I live.**
3  Q. -- of where you live. Okay. I'm a little bit
4  curious here of how well you've been informed
5  of some of the events that happened after this
6  evening. Do you know there was a complaint
7  made about the officer's statement, that
8  statement?
9  A. **Yes, like my lawyer told me, I believe.**
10 Q. I don't want to hear what your lawyer has told
11  you if it's intended to be confidential. He
12  may tell it a little different.
13     MR. THOMPSON: Anything I've told
14  you is between you and I.
15     BY MR. TOWNSLEY:
16 Q. And as we talk today, my questions, I want to
17  know answers from you on your personal
18  knowledge what you know independent of anything
19  you've learned from your lawyer.
20 A. **Okay.**
21 Q. Although this particular question was I was
22  curious whether you knew that that officer had
23  been subject to an investigation for that
24  comment.
25 A. **Not after that. No, I didn't.**

Page 58

1  Q. Are you aware that officer actually got a
2  reprimand for making that comment to you?
3  A. **No.**
4  Q. He did.
5  A. **Okay.**
6  Q. You should know that. They found that that was
7  a violation of a police policy, it was uncalled
8  for and it was a rude comment to the public and
9  he was reprimanded. I can't tell you -- I
10  don't recall what the exact discipline was. It
11  may have been a letter in the file, it may have
12  been a day off, it may have been a written
13  reprimand, but he did receive a reprimand.
14     MR. THOMPSON: As I recall, it was
15  a letter in the file. I could be wrong.
16     MR. TOWNSLEY: A written reprimand,
17  that's what that would be, I think that's
18  correct, and that does go in his
19  permanent employment file.
20     BY MR. TOWNSLEY:
21 Q. What I was asking you about was the tasing, and
22  you're standing up when you get tased; is that
23  correct?
24 A. **Yes.**
25 Q. Do you remember did you have your arms out, did

Page 59

1  you have your arms up?
2  A. **I had 'em up (indicating).**
3  Q. You think you had them up in the air like a
4  surrender?
5  A. **Yes, I did have 'em up.**
6  Q. You just told me a minute ago that you remember
7  taking a step towards the officer and you
8  remember being tased and what happened in
9  between is kind of hazy. Is that still
10  correct?
11     MR. THOMPSON: Objection.
12     Misstates his prior testimony.
13     BY MR. TOWNSLEY:
14 Q. Did you tell me that in this testimony today?
15 A. **Could you repeat the question?**
16 Q. Do you remember -- first, I understand your
17  testimony today is that when you saw your
18  mother on the ground with the officer hovering
19  over her, you started towards the officer and
20  the next thing you remember is being tased. Is
21  that your testimony today?
22 A. **Yes.**
23 Q. When I asked you -- just now you said you know
24  you had your arms up before you were tased, and
25  I'm saying is that in that period of time where

Page 60

1  your memory is not clear? That's my question.
2  A. **Yes. Yes. Yes, because I remember walking,**
3  **not sure if I touched the officer or not, and**
4  **then I remember putting my hands up, being**
5  **tased.**
6  Q. Your memory is not clear whether you touched an
7  officer or not.
8  A. **Yes.**
9  Q. And then you do remember being tased.
10 A. **Yes, and having my hands up asking "why are you**
11  **all doing this".**
12 Q. Do you remember telling a police officer "get
13  that man off my mother" before you were tased?
14 A. **No, I don't remember that.**
15 Q. Do you remember telling an officer to do that
16  twice before you got tased?
17 A. **No.**
18 Q. Do you remember pushing an officer before you
19  got tased?
20 A. **No.**
21 Q. Do you remember turning around and preparing to
22  swing on an officer before you were tased?
23 A. **No, I didn't swing on an officer.**
24 Q. You remember turning around and having your
25  arms up towards an officer and moving towards

Page 61

1  the officer before you were tased.
2  A.  I remember talking to an officer with my hands
3  up before I was tased.
4  Q.  This is still right in that area where you've
5  said your memory is kind of hazy.
6  A.  That was like going towards the officer. After
7  that, I remember everything. Going towards the
8  officer I'm not sure if I touched the officer,
9  but I remember having my hands up asking "why
10 are you all doing this" while my back is facing
11 towards my mom which is on the ground and I had
12 my hands up basically facing this way
13 (indicating) and I remember being tased in the
14 back. Officers over there.
15 Q.  And what do you remember specifically about the
16 tasing because you told me you've been tased
17 twice and I want to understand why you think
18 you were tased twice. Let me ask you this.
19 What do you know about Tasers?
20 A.  Well, I know that when they tase you, they
21 could either keep their hand on the trigger or
22 let go when you fall. I remember just like
23 being shaken for a long time and I remember a
24 stop and then it going again. Like you could
25 hear it stop and then you could hear it going

Page 62

1  again, and that's when I was like going towards
2  the ground when I heard it going again.
3  Q.  You think your hearing was clear and unaffected
4  while you were being tased?
5  A.  Yes.
6  Q.  Were there any visible effects from the Taser?
7     MR. THOMPSON: Objection, vague.
8     BY MR. TOWNSLEY:
9  Q.  Lights, sparks, flashes?
10 A.  No, I wasn't never facing the Taser. I was
11 tased in the back.
12 Q.  So at some point when you're being tased, you
13 fall to the ground; correct?
14 A.  Yes.
15 Q.  And then you remember being lifted -- or being
16 handcuffed?
17 A.  Yes. Handcuffed and then lifted.
18 Q.  Do you remember -- what do you remember about
19 being handcuffed?
20 A.  After I was tased, I remember them turning me
21 over and putting handcuffs on me and about two
22 of 'em lifted me up.
23 Q.  Do you remember if you volunteered your left
24 arm?
25 A.  I didn't volunteer. They grabbed it and put it

Page 63

1  behind my back.
2  Q.  Did you volunteer your right arm?
3     MR. THOMPSON: Objection, vague.
4     BY MR. TOWNSLEY:
5  Q.  Did you volunteer your right arm to the
6  officers for handcuffing?
7     MR. THOMPSON: Object to form of
8     the question.
9  A.  Not really. I don't remember.
10    MR. TOWNSLEY: What's the
11    objection?
12    MR. THOMPSON: The word volunteer.
13    BY MR. TOWNSLEY:
14 Q.  Do you remember if you were compliant with
15 officers' instructions to provide your arms --
16 A.  Yes.
17 Q.  -- at the point they wanted to handcuff you?
18 A.  Yes, I remember.
19 Q.  Do you remember keeping your right arm
20 underneath yourself and not complying with the
21 officers' request for it?
22 A.  No. When I fell, I fell on my right arm, so
23 they had to turn me over to get it out of
24 there. They turned me over and I got it out of
25 there. I didn't resist none when I was getting

Page 64

1  arrested.
2  Q.  Were you yelling at the officers?
3  A.  No. I was asking them why they were doing
4  this -- when they picked me up I asked them
5  "why are you doing this" and that's when the
6  statement was made. Why are you doing this, I
7  got the same degree, so and so. That's when
8  the statement was made and then they sat me in
9  the back of the car.
10 Q.  Did you ever yell "why did you tase me"?
11 A.  Yes. I remember asking -- no. I remember
12 asking why are you all doing this. I don't
13 remember saying why did you tase me.
14 Q.  Did you yell something like "you tased me, you
15 tased me"?
16 A.  No.
17 Q.  Do you remember anyone yelling "Taser" or "tase
18 him" before you were tased?
19 A.  Yes, I remember in the back of me "tase him,
20 tase him" twice.
21 Q.  Could you have heard "Taser, Taser" instead of
22 "tase him, tase him"?
23 A.  No, I remember "tase him, tase him".
24 Q.  And once again, this is before you're tased and
25 you've said this is a period where you don't

Page 69

1 officer to get him off my mother. That's the
2 only part.
3 Q. You don't remember putting your hands on an
4 officer, do you?
5 A. No.
6 Q. Do you remember an officer putting hands on
7 you?
8 A. Picking me up off the ground, yes.
9 Q. After you're tased?
10 A. Yes.
11 Q. So when you're in the police car you're asking
12 them why am I being arrested. You're told
13 battery law enforcement officer. What happens
14 next?
15 A. Well, then they get in the car, shut the door,
16 started driving and I'm saying "I'm sorry" like
17 if I did anything, I didn't mean to. I
18 probably said that a few times, and then we
19 arrived in the intake of the police department.
20 Q. Wherever they took you, you got to the parking
21 lot?
22 A. Yeah.
23 Q. I'm going to guess adult detention facility but
24 I don't really know.
25 A. It was the blue building like in the back. I'm

Page 70

1 not sure where they take me.
2 Q. Was it City Hall where the police station is?
3 Not really critical but now I'm curious.
4 A. I don't know. I know we went into a garage and
5 the garage shutted down, they parked in there,
6 then I remember just walking into a room.
7 Q. You're in a car -- you are not with your
8 mother --
9 A. No.
10 Q. -- Antron --
11 A. No.
12 Q. -- or anyone else; right?
13 A. No.
14 Q. Just the officers and you?
15 A. Yeah. One officer.
16 Q. One officer.
17 A. Yes.
18 Q. Do you know who that officer was?
19 A. Not sure his name, no.
20 Q. Did he tell you that you pushed him?
21 A. He did. I remember he did.
22 Q. So you arrive downtown. You've told the
23 officer -- you've apologized a couple times.
24 A. Yes.
25    MR. THOMPSON: Objection.

Page 71

1    Misstates the testimony.
2    BY MR. TOWNSLEY:
3 Q. Did you tell me that you apologized a couple
4 times?
5 A. No in the car like --
6 Q. That's what I mean, in the car on the way
7 there.
8 A. Not apologizing to him. Apologizing for
9 whatever I'm being arrested for. I'm sorry if
10 I did anything, that's my exact words "I'm
11 sorry if I did anything wrong".
12 Q. That's what I'm saying. You said that a couple
13 times in the car as you're driving downtown;
14 right?
15 A. Yes.
16 Q. So they take you inside and do paperwork?
17 A. Yes. They sit me in the very front and he was
18 like just sit here while I do -- basically book
19 me in, I guess, I'm not sure, and -- no, before
20 they take me inside, that's when my mom comes
21 pulling in and I asked the officer why is she
22 being arrested.
23 Q. This is in the parking garage?
24 A. Yes, in the parking garage. I asked why is she
25 being arrested. He was like -- I don't think

Page 72

1 he told me nothing at that point in time, so we
2 walked in, he sat me down to take paperwork and
3 my mother comes in. I see her and I turn
4 around and ask my mom "are you okay".
5 Q. Let me ask you a couple of questions here.
6 When you come in, what's your attitude like?
7 A. Calm, cool.
8 Q. Did the officer take the handcuffs off of you
9 while you're doing paperwork?
10 A. Yes.
11 Q. And then your mother comes in?
12 A. Yes.
13 Q. How does that affect you?
14 A. It didn't really affect me. I was just asking
15 like "Mom, are you okay". That's the first
16 thing I said.
17 Q. Did you say that sitting down, did you stand
18 up? What did you do?
19 A. I kind of turned around like this
20 (indicating) -- well, she was back. I kind of
21 turned my back around, asked her twice -- well,
22 asked her "are you okay" and --
23 Q. What did the officer that was booking you do?
24 A. Nothing.
25 Q. Did you say anything to him?

Page 73

1 A. No.
2 Q. Did he tell you to sit down? Did you stand up?
3 A. No, I didn't stand up.
4 Q. You didn't stand up? You didn't yell at the
5 officer about why is your mother in jail?
6 A. No. What I did was I wasn't even talking to no
7 officers. I asked my mother "are you okay".
8 The officer that had her said "shut up and turn
9 around".
10 Q. And what did you do?
11 A. I said "well, I have the right to ask my mom is
12 she okay". So he comes walking around towards
13 the front towards me and that's when I stand
14 up.
15 Q. And did the officer that was booking you tell
16 you to sit down then?
17 A. I'm not sure if he said anything. I remember
18 standing up and then three officers, one behind
19 me and like one right here (indicating) -- it
20 was about four all together plus the officer
21 that had my mom came up there.
22 Q. Was one of those the officer that had been
23 booking you?
24 A. Not sure because they -- no, I'm not sure.
25 Q. Did Officer Henry try to put your hand in a

Page 74

1 handcuff?
2 A. No, the officer behind me -- I'm not sure who
3 was behind me, but the officer behind me put my
4 hand -- like took this hand (indicating) --
5 Q. And you put your right hand behind your back
6 when you said that; right?
7 A. Yeah. And then as soon as they did that, I had
8 my hands basically handcuffed. Officer Henry
9 knees me in my thigh three times right here
10 left side (indicating).
11 Q. So in your left thigh between your hip and your
12 knee?
13 A. Yes.
14 Q. On the outside?
15 A. Yes, outside.
16 Q. And you're standing up at this point?
17 A. Yes.
18 Q. And you don't remember if you've been told to
19 sit down or not?
20 A. No, didn't nobody tell me to sit down. I don't
21 remember any of -- nobody telling me to sit
22 down.
23 Q. Could they have and you don't remember?
24 A. I only stood up -- only time I stood up was
25 when he came around there basically.

Page 75

1 Q. And were you completely cooperative after that?
2 A. Yes.
3 Q. Did they move you to a different area?
4 A. Well, after he kneed me, they put me up against
5 the wall with my hands behind my back and
6 Officer Henry grabs my thumb and twist it.
7 Like I had my hands behind my back like this
8 (indicating) and he kind of twisted up like
9 that with the handcuffs on (indicating).
10 Q. So he used your thumb as a leverage to control
11 you?
12 A. I was already controlled. I was in handcuffs.
13 I wasn't resisting. It was about four of 'em
14 took me back there like -- four of 'em was
15 still around me, I believe. Three to four.
16 Q. Do you remember being asked if you wanted
17 medical care?
18 A. Yes.
19 Q. You were asked; correct?
20 A. Yes.
21 Q. Did you refuse it?
22 A. Yes.
23 Q. And they asked you because you had a bloody
24 lip; correct?
25 A. Yes.

Page 76

1        (Marked for identification
2        Deposition Exhibit Number 8.)
3        BY MR. TOWNSLEY:
4 Q. I'm going to hand you what I'm marking as
5 Exhibit 8. That is a Main Booking, Booking
6 Report. Do you see that caption on the top?
7 A. Yes.
8 Q. Do you see a date and time 6-6-2010, 3:10 a.m.
9 in the morning?
10 A. Yes.
11 Q. And this is a black and white copy so it's a
12 pretty poor picture, but were you wearing maybe
13 a hoodie that night? I can't tell.
14 A. Yes, I believe.
15 Q. This is your name on here. I'm not going to
16 ask you to identify the picture, but this is
17 your name; correct?
18 A. Yes, that's my name.
19 Q. You're telling me that you were compliant and
20 complacent to the officers' instructions that
21 night; is that correct?
22 A. Inside the booking or --
23 Q. Yes.
24 A. Yeah.
25 Q. Do you see on the bottom where it says there's

Page 77

1 no intake photo because you were combative?
2 A. Yes.
3 Q. Do you remember having an intake photo taken?
4 A. No. All I remember is them putting me -- about
5  three or four of 'em walking me to a room and
6  putting me in a room and that's it.
7 Q. Did you -- do you remember if you signed a
8  property sheet or not?
9 A. No, I didn't. All I remember is being in the
10  room -- from the intake area to the room.
11 Q. Are you aware you were charged with resisting
12  arrest after this event?
13 A. I was not charged.
14 Q. You were not charged with resisting arrest?
15 A. No.
16 Q. I was going to ask you if you were aware you
17  were charged with resisting arrest for your
18  conduct at the booking area, but if I did that,
19  is your testimony today that you were not
20  charged with resisting arrest?
21   MR. THOMPSON: Object to the extent
22   it calls for a legal conclusion.
23   BY MR. TOWNSLEY:
24 Q. Do you know what you were charged with, sir?
25 A. Battery on an LEO.

Page 78

1 Q. And what was the result of that charge for
2  battery LEO?
3 A. Like my punishment?
4 Q. No. Were you found guilty is what I'm asking.
5  Were you convicted?
6 A. Yes. Yes.
7 Q. Was that in municipal court in the City
8  Building?
9 A. Yes, City Building. The black building.
10 Q. And what was your sentence for that?
11 A. Year probation and -- just fines and year
12  probation.
13   (Marked for identification
14   Deposition Exhibit Number 9.)
15   BY MR. TOWNSLEY:
16 Q. Going to hand you what I've marked as
17  Exhibit 9. Do you see the caption on that
18  document?
19 A. Yes.
20 Q. Does it say Journal Entry-Misdemeanor Case?
21 A. Yes.
22 Q. This is a journal entry for a misdemeanor case
23  and it says for Count I, obstructing legal
24  process. Do you see that?
25 A. Yes.

Page 79

1 Q. Do you know what that was for?
2 A. They had lowered the battery -- oh. They had
3  lowered the battery on LEO and basically that's
4  what they charged me with, I believe.
5 Q. So in the 18th Judicial District of Sedgwick
6  County, you had a charge Count I of obstructing
7  legal process and you were found -- I'm sorry.
8  You pled nolo contendere to that charge; is
9  that correct?
10 A. What does that mean?
11 Q. That means I'm not saying I did it but you can
12  convict me. I'm not saying I'm guilty, I'm not
13  saying I'm innocent, I'm not saying either but
14  you can convict me.
15 A. No, we went to trial and the judge said you're
16  not guilty for resisting arrest but for the
17  obstruction legal process.
18   MR. THOMPSON: I'm going to put an
19   objection in on this Exhibit 9 and
20   questions about his trial and everything
21   else to the extent they call for legal
22   conclusions.
23   MR. TOWNSLEY: That's fine. I'm
24   just trying to find out what happened.
25   MR. THOMPSON: And I understand.

Page 80

1   MR. TOWNSLEY: Which is to say I'm
2   not asking for legal conclusions.
3   (Marked for identification
4   Deposition Exhibit Number 10.)
5   BY MR. TOWNSLEY:
6 Q. Sir, I'm going to hand you what I'm marking as
7  Exhibit 10, ask you to take a look at that.
8  This is a pleading record essentially for the
9  Municipal Court. Have you ever seen this
10  document before?
11 A. Yes.
12 Q. You have. Do you see in Municipal Court for
13  the City of Wichita, Kansas where it indicates
14  you had Count I, battery LEO and Count II,
15  resist arrest?
16 A. Yes.
17 Q. So were you or were you not charged with
18  resisting arrest in Municipal Court?
19 A. I was not charged.
20 Q. Were you found not guilty of resisting arrest
21  in Municipal Court?
22 A. Yes.
23 Q. So you were charged with it but you were found
24  not guilty.
25 A. Yes.

Page 81

1  MR. THOMPSON: Objection to get
2  extent it calls for a legal conclusion as
3  to the meaning of the word charged.
4  BY MR. TOWNSLEY:
5  Q. Does this document indicate that you were found
6  not guilty of resisting arrest?
7  A. Yes.
8  Q. Does this document indicate you were found
9  guilty of battery on a law enforcement officer?
10 A. Yes, which they lowered.
11 Q. So you were tried in Municipal Court and found
12 guilty of battery on a law enforcement officer,
13 not guilty of resisting arrest; correct?
14 A. Yes.
15 Q. Have you ever seen the charge for your battery
16 law enforcement officer?
17 A. What do you mean?
18    (Marked for identification
19    Deposition Exhibit Number 11.)
20 BY MR. TOWNSLEY:
21 Q. Sir, I'm going to hand you what I've marked as
22 Exhibit 11 and this is a Uniform Criminal
23 Complaint and Notice to Appear; is that
24 correct?
25 A. Yes.

Page 82

1 Q. Do you see on here where the charge against
2 Travis Patterson is battery law enforcement
3 officer?
4 A. Yes.
5 Q. Do you see the signature of the officer below
6 that?
7 A. Yes.
8 Q. Can you read that signature?
9 A. I think it's C. Watts.
10 Q. It's actually Wills.
11 A. Wills?
12 Q. That's Officer Wills. This document, I'm going
13 to ask you if I read this correctly, but
14 Officer Wills has charged Travis Patterson
15 within the corporate limits of the city
16 intentionally caused physical contact with
17 Officer Wills, 2288, uniformed or properly
18 identified state, county or city law
19 enforcement officer while such officer engaged
20 in the performance of such officer's duties in
21 I believe that says rude, insolent or angry
22 manner by pushing him in the chest one time.
23 Do you see that?
24 A. Yes.
25 Q. Is that what you were convicted of in Municipal

Page 83

1  Court?
2  A. Like am I admitting to pushing him or just --
3  that's what I was convicted of, but I'm not
4  admitting to pushing him.
5  Q. Because you don't remember; right?
6  A. Because I know I didn't push him.
7  Q. You didn't push an officer.
8  A. I didn't push an officer.
9  Q. How do you know that?
10 A. Because they probably would have tackled me if
11 I did. Like I wouldn't have had a chance to
12 walk towards my mom if I did put my hands on
13 the officer. That was a lot of time from me
14 being on the curb to walking towards my mom.
15 Q. So it your testimony you had a slow walk from
16 the curb towards your mother?
17 A. Yes.
18 Q. Your mother's on the ground underneath a police
19 officer and you're walking slowly towards her
20 to help her; is that correct?
21 A. It wasn't in no fast pace. It was like --
22 because it was only a few feet, so it wasn't
23 like slow but it was like walking. Regular
24 walking. I wasn't charging at him, I didn't
25 run at him. I was walking.

Page 84

1 Q. Had you ever heard before today that you were
2 charged with pushing Officer Wills in the
3 chest?
4 A. Yes, I believe. For a minute I thought it was
5 because of the officer that had my mom, and
6 then I found out it was for him (indicating).
7 Q. And when did you find that out?
8 A. Like during the trial process -- no, the intake
9 process. Like he said you pushed me or
10 whatever, yes.
11 Q. So you've known that since then.
12 A. Yes.
13 Q. You are telling me today under oath that you
14 didn't push an officer; is that correct?
15 A. Yes.
16 Q. And you've known that since June 6, 2010;
17 correct?
18 A. Yes, because I mean how can you say I'm not --
19 basically that's what he said, you're not going
20 to jail, you're not being arrested and then I'm
21 being charged the next day. That was their
22 words, you're not going to jail, you're not
23 being arrested.
24 Q. Ultimately, after you were convicted of
25 resisting arrest and acquitted of -- I'm sorry.

Page 85

1  After you were convicted of battery law
2  enforcement officer and acquitted of resisting
3  arrest, somehow or in some way you appealed
4  that claim to the District Court; is that
5  correct?
6  A. Yes.
7  Q. And at some point in that process, your charge
8  was amended to obstructing legal process; is
9  that correct?
10 A. Yes.
11 Q. And that is what you were ultimately fined for.
12 A. Yes.
13 Q. Now the journal entry I have for the 18th
14 District says that you were given parole --
15 A. Probation.
16 Q. Probation or parole, a 90-day sentence of
17 confinement and $200 charges. Is that what you
18 ultimately ended up --
19 A. No, I didn't serve no time.
20 Q. You didn't serve any time but you paid some
21 court costs and some fines.
22 A. Yes.
23 Q. And were on probation for a period of time?
24 A. A year.
25 Q. Did that require meeting with probation

Page 86

1  officers --
2  A. Every month.
3  Q. -- and all that supervision? How long did that
4  go on?
5  A. For a whole year. I just went in every month
6  for a whole year.
7  Q. Did you have any problem with that?
8  A. No.
9  Q. Anything about that process bother you other
10 than the fact you had to be in it?
11 A. No. I asked him the question that my probation
12 officer asked if you saw your mom in that
13 situation what would you do. He said I
14 probably would have did what you did.
15 Q. And you're not sorry today that you did it, are
16 you?
17    MR. THOMPSON: Objection, vague.
18    BY MR. TOWNSLEY:
19 Q. Let me ask you are you sorry that you engaged
20 with the officers on June 6, 2010?
21    MR. THOMPSON: Object to the form
22    of the question.
23 A. Really I don't think I did nothing wrong so...
24    BY MR. TOWNSLEY:
25 Q. That's because you were protecting your mother;

Page 87

1  is that right?
2  A. Yes.
3  Q. And would you do it again?
4  A. To protect her, yes.
5  Q. And that's why I'm asking you're not really
6  sorry about what you did that night, are you?
7  A. I'm sorry if I put my hands on the officer, but
8  other than like protecting her, like I believe
9  I was in the right.
10 Q. Sometimes the right thing's not the legal
11 thing; is that right?
12 A. Yes.
13 Q. Did you have any training in your criminal
14 justice on crowd control?
15 A. It was online and I remember reading about it.
16 Q. So you had some readings but no --
17 A. Hands-on.
18 Q. -- hands-on?
19 A. No.
20 Q. How about dealing with loud or unruly people?
21 Did you have training with that or did you have
22 readings on that?
23 A. Yes, I had readings on that.
24 Q. What are some of the ways for a police officer
25 to enforce his authority when he approaches a

Page 88

1  larger crowd of people?
2     MR. THOMPSON: Objection to the
3     extent it calls for a legal conclusion.
4     BY MR. TOWNSLEY:
5  Q. You can answer.
6  A. Let it be known that the officer is there and
7  basically give orders like to either be
8  separated or to calm down a situation.
9  Q. So it's appropriate for an officer to be
10 authoritative and commanding as he encounters
11 the situation?
12    MR. THOMPSON: Objection to the
13    extent that you're asking him his expert
14    opinion.
15 A. Yes.
16    BY MR. TOWNSLEY:
17 Q. Have you ever seen the Uniform Criminal
18 Complaint and Notice to Appear for your
19 resisting arrest charge?
20 A. Yes.
21 Q. I'm going to mark that as Exhibit 12 and hand
22 that to you.
23    (Marked for identification
24    Deposition Exhibit Number 12.)
25 A. Yes, I saw that. Yes.

Page 89

1  BY MR. TOWNSLEY:
2  Q. Is this signed by the same officer?
3  A. Yes.
4  Q. Officer Wills?
5  A. Yes.
6  Q. Do you see what Officer Wills specifically
7  charged you with in this instance on this page?
8  A. Resisting.
9  Q. Yes. I'm going to read the paragraph under
10 that. You tell me if I read it accurately.
11 Travis V. Patterson resisted Officer Wills,
12 #2288 in the discharge of his official duty by
13 not allowing officer to handcuff him while in
14 the jail. Officer had to physically force him
15 to comply and handcuff him.
16 A. That's not right.
17 Q. It's an accurate reading, isn't it? You
18 disagree with what it says?
19 A. I disagree.
20 Q. Are you done with your probation from this
21 event?
22 A. Yes.
23 Q. Mr. Patterson, are you alleging any medical
24 injuries from this event?
25     MR. THOMPSON: Objection to the

Page 90

1  extent it calls for a medical conclusion.
2     BY MR. TOWNSLEY:
3  Q. Are you claiming pain and suffering in this
4  case for any injuries? My question is are you
5  claiming pain and suffering in this case for
6  any injuries?
7     MR. THOMPSON: Objection to the
8  extent it calls for a legal conclusion.
9     MR. TOWNSLEY: If that's a no, I'll
10 accept the objection.
11    MR. THOMPSON: It's not a no.
12 A. Yes.
13    BY MR. TOWNSLEY:
14 Q. What's the injury -- or, I'm sorry. Did you
15 have a physical injury that you're alleging
16 from this event?
17 A. The tasing and the kneeing and the thumb being
18 twisted and the officer's comments.
19 Q. And what is it about the officer's comments
20 that's part of your claim?
21 A. Shouldn't have been said no matter who you is
22 or where you come from. If I was the officer
23 arresting him, I wouldn't say that to him if he
24 lived in a trailer park.
25 Q. I appreciate that, but what I'm trying to

Page 91

1  determine is if you think this was illegal or
2  unlawful or wrongful in some way that is part
3  of a legal action?
4  A. Yes.
5     MR. TOWNSLEY: Counsel, I'm just
6  going to state for the record that's not
7  alleged as a claim because that would be
8  a disparate treatment or a racial
9  discrimination type claim and I'm not
10 aware of that in your pleadings. Have
11 you made a disparate treatment claim or
12 unequal treatment claim?
13    MR. THOMPSON: I don't have the
14 petition in front of me, Chan. I don't
15 remember. I've got too many cases with
16 you guys right now. I can't remember
17 which is which.
18    BY MR. TOWNSLEY:
19 Q. With regard to your tasing, sir, you allege
20 that happened twice; is that correct?
21 A. Yes.
22 Q. Do you have an estimate of the length of time
23 that you were tased?
24 A. No. I was just -- it was long.
25 Q. It seemed like a long time, didn't it?

Page 92

1  A. Yes.
2  Q. Where did the Taser strike you? I think you
3  said in the back.
4  A. Top like kind of right here (indicating).
5  Q. You're pointing to about left shoulder blade --
6  A. Yeah.
7  Q. -- in the back.
8  A. And like another one was somewhere around here
9  (indicating).
10 Q. And the other probe was somewhere in the lower
11 right back?
12 A. Yes.
13 Q. Do you know if you have any marks from that?
14 A. I believe I still do. I'm not sure. I can't
15 really see my back.
16 Q. Have those marks on your back been any sort of
17 a mental or physical issue for you?
18    MR. THOMPSON: Object to the form
19 of the question.
20 A. Mental? I'm not sure what you mean.
21    BY MR. TOWNSLEY:
22 Q. I'm asking if the fact that you have a mark on
23 your back if you have a mark on your back is
24 something that causes you mental distress.
25 A. When I think about it.

Page 101

1  regard to you?
2  A.  The kneeing and the thumb twist.
3  Q.  So the knee and the thumb twist.
4  A.  Yes. It's like that was not called for.
5  Q.  With regard to Antron's arrest, is there
6  anything you think was done that was
7  unprofessional or inappropriate?
8  A.  Well, yes. I mean they didn't have to tackle
9  him in -- I heard they had their knee in his
10 throat tackling him and basically did him wrong
11 over there. I wasn't sure what all they did
12 but it was like four of 'em. I think it would
13 have been a lot better if they would have came
14 asking or saying what's going on or something
15 and it wasn't none of that, period, at all.
16 Q.  Would you like to know why they didn't or why
17 they came in the way they did?
18 A.  Yes.
19 Q.  You're going to find out in this lawsuit. With
20 regard to the arrest of your mother --
21 A.  And can I say something?
22 Q.  Yes.
23 A.  What you just said, I'm going to find out,
24 well, wasn't nothing going on when they arrived
25 basically. We were leaving. He was in his car

Page 102

1  about to leave, so it shouldn't have been
2  anything of them rushing the scene like that.
3  Q.  On June 6, 2010, were you aware that your
4  brother was wanted?
5  A.  Yes.
6  Q.  Were you aware that he had felony warrants on
7  him?
8  A.  Yes.
9  Q.  Do you know what they were for?
10 A.  I believe a rape case or something. The same
11 officer -- time before that the same officer
12 thought I was him that was looking for him.
13 Q.  Do you think if officers respond to a call of
14 domestic violence, see an individual with a
15 bloody shirt, recognize that he's a wanted
16 felon, that they should arrest that individual?
17    MR. THOMPSON: Objection to the
18    extent it calls for expert opinion.
19    BY MR. TOWNSLEY:
20 Q.  Or should they walk up and just talk to him?
21 A.  They could have pulled down there and basically
22 let it be known that they're here. I don't
23 think it would have went the way that it went.
24 Q.  You were already aware they were there,
25 correct, because Shannon had told everyone; is

Page 103

1  that correct?
2  A.  Yes, and that's why they were calming him down
3  and they were walking to the car.
4     MR. TOWNSLEY: This would be a good
5     time to take a break then.
6     (A brief recess was taken.)
7     BY MR. TOWNSLEY:
8  Q.  Mr. Patterson, while you are being tased, where
9  is Audre?
10 A.  On the sidewalk up under that tree right there.
11 Q.  Between the tree and your car?
12 A.  No, a little bit behind that like a little bit
13 north of that.
14 Q.  Where is Shannon?
15 A.  I'm not sure where she was.
16 Q.  And your mother is with the officers, Antron is
17 with the officers and you are with the
18 officers; correct?
19 A.  Yes.
20 Q.  Did you talk to officers at any time before
21 your mother was taken to the ground?
22 A.  No.
23 Q.  You were standing over under on the curb near
24 the driveway and your car?
25 A.  Yes.

Page 104

1  Q.  And your car is a blue Stratus; is that right?
2  A.  Yes.
3     (Marked for identification
4     Deposition Exhibit Number 13.)
5     BY MR. TOWNSLEY:
6  Q.  I'm going to hand you Exhibit 13. Is that your
7  license tag or was it in 2010?
8  A.  Yes.
9     (Marked for identification
10    Deposition Exhibit Number 14.)
11    BY MR. TOWNSLEY:
12 Q.  Sir, after you were arrested -- I'm handing you
13 Exhibit 14. This is a picture of a loaded
14 Beretta that was found on the trunk of that
15 vehicle. Where did that gun come from?
16 A.  I don't know.
17 Q.  You know you're under oath today, don't you?
18 A.  Yes.
19 Q.  That's the car you had been driving less than a
20 half hour earlier; correct?
21 A.  Yes.
22 Q.  There wasn't any gun on it when you were
23 driving it, was there?
24 A.  No.
25 Q.  Where do you think it came from?