# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| MARY PATTERSON, and TRAVIS PATTERSON, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 12-CV-1308-JAR |
| CITY OF WICHITA, KANSAS, and OFFICER J. HENRY, | ) ) ) ) | |
| Defendants. | ) ) ) ) | |

## MEMORANDUM AND ORDER

Plaintiffs bring this action asserting claims of excessive use of force, malicious prosecution and false arrest under 42 U.S.C. § 1983, and state law claims for negligent use of force and intentional infliction of emotional distress.[1]  This matter is before the Court on Defendants' Motion for Partial Summary Judgment (Doc. 77).  Defendants' motion seeks summary judgment on the following: Plaintiff Mary Patterson's malicious prosecution claim; both Plaintiffs' state law claims of negligent use of force claims and intentional infliction of emotional distress; and the City of Wichita's liability under the federal §1983 claims.  Plaintiffs have conceded that the City of Wichita is not liable for the federal claims.[2]  The motion is fully briefed and the Court is prepared to rule.  As described more fully below, the Court grants in part

---

[1]Plaintiffs voluntarily abandoned their negligent infliction of emotional distress claims and failure to train claims.  *See* Pretrial Order, Doc. 74 at 12.

[2]*See* Doc. 79 at 26 ("Plaintiff voluntarily withdraws any claims regarding imposing liability pursuant to K.S.A. 75-6116 for any federal claims.").

and denies in part Defendants' motion for partial summary judgment.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[3] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[4] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[5] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[6] An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[7]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[8] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an

---

[3]Fed. R. Civ. P. 56(a).

[4]*City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[5]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[6]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[7]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[8]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

essential element of the nonmovant's claim.[9]

Once the movant has met the initial burden of showing the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[10]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[11]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[12]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[13]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[14]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[15]

---

[9]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[10]*Anderson*, 477 U.S. at 256; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[11]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[12]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71); *see Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[13]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[14]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[15]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    UNCONTROVERTED FACTS

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiffs.

Plaintiff Travis Patterson and Antron Cox are brothers.  Plaintiff Mary Patterson is their mother.  On June 6, 2010, Travis was living with Mary, along with Travis' girlfriend Audrey Martinez and Travis and Audrey's two small children.  On June 6, 2010, sometime after midnight, Travis and Antron were "cussing and wrestling" with each other in the front yard of Mary's house.  The two had been out to a bar earlier in the evening and had each consumed two and a half alcoholic drinks.  Mary heard them from inside the house and went outside to see what was happening.  She tried to physically separate the men bu twas unable to do so.  She observed that Travis had blood on his lip.  Mary told them to stop or she would call the police.  They did not stop so Mary told Audrey, who had come outside, to call the police.  At that time, Mary was aware that there was a felony warrant for Antron's arrest—he was wanted on a rape charge.  Audrey called 911, saying that her boyfriend and his brother were fighting and they needed officers to assist.  She said one of the men was wounded but did not need an ambulance.

Antron's girlfriend, Sharmon Phares, drove to Mary's home from a night club.  She passed two parked police cars up the street from Mary's house.  Two police officers were standing outside the cars talking.  Phares drove by the officers and parked across the street from Mary's house.  Phares exited her vehicle and walked toward Travis and Antron, who were arguing.  She asked what was going on, and she advised Travis and Antron that there were police cars parked up the street.

Sharmon and Antron walked to Sharmon's van and got in to leave.  But several

uniformed police officers arrived—some in cars, some on foot—coming around the street corner from the south. According to Mary, they were shining flashlights and shouting "Shut the fuck up. Get the fuck back. Get the fuck back." Mary saw several police officers pull Antron away from the van, throw him to the ground, and then sit on him. Phares got out and stood at the back of the van. Mary joined Phares at the rear of the van where she could see Antron. Audrey was there as well.

Mary testified that she was "furious" because of "all of this happening" and was "hollering at the officers to get off him [Antron], let him breathe." Mary said that an office other than Officer Henry shined a flashlight in her face and told her to "[g]et the fuck back." Mary said the next thing she knew, Officer Henry struck her in the throat and knocked her to the ground, laying on top of her. A nearby neighbor, Nazeeh Shahid, called 911 requesting a supervisor be sent to the scene after he saw Defendant Henry tackle Mary Patterson in the street.

Travis said he saw a police officer "basically tackle" Mary and she landed on her left side. Travis testified that he went toward his mother but he can't remember whether he pulled the police officer off of her. Travis does remember putting his hands up in the air and asking the officers why they were doing this to Mary. Travis said the next thing he remembers is being tased twice in the back. Travis testified that he told an officer that he (Travis) had an associate's degree in criminal justice. The officer said Travis' degree "ain't like mine . . . because of where you live." Travis was handcuffed and put in the back of the police car.

Mary was handcuffed and told to sit on the curb. Mary testified that the duration of time from when the police arrived until she was handcuffed and sat on the curb was approximately fifteen to twenty minutes. Officer Henry took Mary to the police station. Mary testified that

Officer Henry told her to shut up and quit crying.  He also told another officer that Mary battered

him.  Travis was also taken to the police station.  His handcuffs were removed.  Mary arrived at

the station after Travis arrived.   Travis asked Mary if she was okay.  Officer Henry, told Travis

to shut up and turn around.  Travis replied that he had the right to ask his mother if she was okay.

Officer Henry then approached Travis  Travis responded by rising from his chair to a standing

position.  Several officers surrounded Travis.  One pulled Travis' hands behind his back to

handcuff him.  Travis testified that Officer Henry kneed him in the outer left thigh three times.

Travis said he was placed up against a wall with his hands behind his back and Officer Henry

grabbed his thumb and twisted it.

Travis was charged with battery of a law enforcement Officer Casey Wills,  and resisting

arrest.  He was convicted of the battery charge in municipal court and found not guilty of

resisting arrest.  Travis appealed the conviction. During the appeal process, the battery charge

was amended to obstructing legal process.  Travis pled no contest to this charge and received

fines and probation.

Mary was also charged with battery of a law enforcement officer.  She was booked and

released on June 6, 2010.  According to jail records the booking process took one hour and

fifteen minutes.  Mary was still wearing her nightclothes.

Mary was arraigned on June 25, 2010 and she was released on her own recognizance

pending trial.  Mary was provided a court-appointed defense attorney.  She was found not guilty

in municipal court on September 24, 2010.

Mary testified that she was depressed and taking medication for her depression before the

incident and that after the incident she suffered nightmares and became more depressed.  She

said her doctor increased her dose of depression medication. Mary said she was paranoid and anxious before the incident, but became worse after the incident.

Travis testified that he is embarrassed "in a way" when someone asks about the Taser marks on his back and he reveals he has been tased.

Before June 6, 2010, the City of Wichita had placed into effect a use of force policy, Regulation 4.0, which addressed use of electronic control devices, *i.e.* tasers, at §4.117-4.126. WPD Reg. 4, §4.131 entitled "Unnecessary/Excessive Force" states that "Only such force as is reasonably necessary shall be used to control an individual or situation. Members shall use extreme caution when using any police weapon or tactic." WPD Reg. 4 § 4.131(A) states "Unnecessary use of force is strictly prohibited." WPD Reg. 4 §4.131(B) states "Excessive Force is strictly prohibited." WPD Regulation 4.101 states in part that "[a] member's decision, relative to the use of force, must be legally justifiable, considering both the nature of the crime and circumstances surrounding the incident." WPD Reg. 4 §4.101 states;

> "This Department recognizes and respects the value and special integrity of each human life. In vesting police members with the lawful authority to use force to protect the public welfare, a careful balancing of all human interests is required. Therefore, it is the policy of this Department that police members shall use only that force that is reasonably necessary to effectively bring an incident under control, or while protecting the life of the member, or the life of another person."

In Defendant Henry's Supplemental Report, he states that he "placed [his] right palm on her clavicle & sternum area" and "gently begin [sic] pushing her away," and that he "attempted to spin her around & place her on the ground." Defendant Henry testified that he put his left foot in front of Mary, spun her to do a trip, and then put her on the ground. Defendant Henry further stated that he learned the tripping maneuver in the police academy and it is called a trip

technique or balance displacement. Defendant Henry testified that the manner in which he took Mary to the ground was "gently due to her age" and "soft". Defendant Henry states in his Supplemental Report that Mary had a "slight scratch on the top of her foot."

Medical records from Via Christi dated July 26, 2010, show that Mary Patterson was diagnosed with an Avulsion Fracture of the left foot and given a boot to wear since the foot could not be surgically repaired. Avulsion fractures are very painful according to the medical documentation provided by Via Christi.

Defendant Henry arrested Mary Patterson without a warrant for allegedly battering him. Defendant Henry swore to the truthfulness of the arrest report and signed his name under penalty of perjury. Defendant Henry signed and swore to the truthfulness of the information contained in the Uniform Criminal Complaint under penalty of perjury.

Mary Patterson had to appear in court numerous times before her trial. Andrea Conlee, Mary's Licensed Clinical Social Worker (LSCSW) at Comcare of Sedgwick County, noted Mary had Post Traumatic Stress Disorder on or about July 15, 2010. Conlee stated in her Comcare Progress Note for June 21, 2010 regarding Interventions (activity and progress towards goals) that Mary was "very angry, sad, tearful, her son had a warrant for arrest, the police arrived one night and all three taken to police department." The treatment goal was to decrease Mary's symptoms of anxiety. Conlee further stated in the Comcare Progress Note for August 16, 2010 that Mary went to court the prior week and that Mary was "asked to pay two hundred dollars for the altercation." She also notes that Mary told her the police did not appear and that Mary felt she would be in jail if she did not appear. Mary stated "I was done so wrong" and "the incident keeps bothering me."

In the Comcare records for September 13, 2010, Conlee stated that Mary said "Just everything going on, I don't feel good, tired of thinking about stuff, some days don't feel like I am going to make it." Mary said she went to court again for the "WPD matter" and the policemen did not show again. Conlee stated that Mary cries. The Comcare records for November 4, 2010 state that Mary reports suffering "terrible nightmares" and that she "needs to scream, relive being pushed when the police came. Cries and cries." Conlee described her as "tearful." Comcare records for January 5, 2011 state that Conlee and Mary "worked together to prepare her for court on 1-24-11." Conlee noted Mary is "having a hard time focusing, hard to make decisions." Ms. Conlee encouraged Mary to contact her doctor to get a medication to help her remain calm during court. Mary notes her heart rate increases with stress.

## III. DISCUSSION

### A. Malicious Prosecution - § 1983

Plaintiff Mary Patterson brings a claim for malicious prosecution pursuant to § 1983, claiming that she "suffered a deprivation of liberty as a result of her unlawful seizure under the 4th amendment to the United States Constitution."[16] Section 1983 provides a federal civil remedy for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting under color of state law.[17] The Tenth Circuit has held that although the "starting point" for the analysis of a § 1983 malicious prosecution claim is the

---

[16]Doc. 74 at 12. Plaintiff does not allege a violation of the Fourteenth Amendment. *See Albright v. Oliver*, 510 U.S. 266, 271 n. 4 (1994) (plurality of the Supreme Court concluding that "substantive due process may not furnish the constitutional peg on which to hang" a federal malicious prosecution tort); *see also Myers v. Koopman*, 738 F.3d 1190, 1194 (10th Cir. 2013) (dismissing Fourteenth Amendment claim because where state actor's harmful conduct is unauthorized and thus could not be anticipated pre-deprivation, then an adequate post-deprivation remedy—such as a state law malicious prosecution claim—will satisfy due process requirements.).

[17]42 U.S.C. § 1983.

common law elements of malicious prosecution, the ultimate question is "whether the plaintiff has proven a *constitutional* violation."[18]

The Court must determine whether Plaintiff Mary Patterson has shown a Fourth Amendment violation to support her malicious prosecution claim. In this case, Mary Patterson was arrested without a warrant, booked and released the same night. Defendants claim that a warrantless arrest that occurs prior to arraignment or charges being filed with the court is not a deprivation of liberty sufficient to support a malicious prosecution claim because it was not "pursuant to legal process." "Generally, the offending legal process comes either in the form of an arrest warrant (in which case the arrest would constitute the seizure) or a subsequent charging document (in which case the sum of post-arraignment deprivations would comprise the seizure)."[19]

The Tenth Circuit Court of Appeals in *Myers v. Koopman*, recognized this distinction in addressing the proper accrual date for plaintiff's § 1983 claim.[20] The Tenth Circuit noted that whether the claim was properly classified as malicious prosecution or false imprisonment affected the accrual date and whether the claim was time-barred. In addressing the distinction, the Tenth Circuit found that plaintiff correctly styled his claim as one for malicious prosecution

---

[18]*Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996) (emphasis in original) (noting that in the § 1983 malicious prosecution context, that constitutional right is the Fourth Amendment's right to be free from unreasonable seizures.)

[19]*Nieves v. McSweeney*, 241 F.3d 46, 54 (1st Cir. 2001) (citing *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995)); *see also Grant v. John Hancock Mut. Ins. Co.*, 183 F. Supp. 2d 344, 358–59 (D. Mass. 2002) (where plaintiff was arrested without a warrant and released after he was booked at the police station, there was no "seizure" to support a Fourth Amendment violation.).

[20]738 F.3d 1190, 1194–95 (10th Cir. 2013).

because he was seized after the institution of legal process.[21]  The court stated that:

> What separates the two claims?—the institution of legal process. Unreasonable seizures imposed without legal process precipitate Fourth Amendment false imprisonment claims.  *See Wallace*, 549 U.S. at 389, 127 S. Ct. 1091 (concluding that false imprisonment was the proper analogy where defendants did not have a warrant for the plaintiff's arrest and thus detention occurred without legal process).  Unreasonable seizures imposed with legal process precipitate Fourth Amendment malicious prosecution claims.  *See Heck*, 512 U.S. at 484, 114 S. Ct. 2364 (where detention occurs with legal process the "common-law cause of action for malicious prosecution provides the closest analogy").  Like rain and snow, the claims emanate from the same source, but under different conditions.[22]

The Court cited its earlier decision in *Wilkins v. DeReyes*, where it also employed the legal-process distinction.[23]  The Court found that "where detention occurs after the institution of legal process, a plaintiff can claim that the legal process itself was wrongful, and thereby state a 'Fourth Amendment violation sufficient to support a § 1983 malicious prosecution cause of action.'"[24]  Likewise, malicious prosecution and false arrest are distinguishable based on whether or not detention occurred before or after the institution of legal process.[25]  The Court notes that Plaintiff Mary Patterson also has a pending claim for false arrest based on an alleged violation of her Fourth Amendment rights that is not subject to the instant motion for partial summary

---

[21]*Id.* at 1194.

[22]*Id.* (internal footnote omitted).

[23]*Id.* at 1194–95 (citing *Wilkins v. DeReyes*, 528 F.3d 790 (10th Cir. 2008)).

[24]*Id.* at 1195 (citing *Wilkins*, 528 F.3d at 799).

[25]*See id.* at 1195 n.4 (citing *Whiting v. Traylor*, 85 F.3d 581, 583–86 & n. 8 (11th Cir. 1996)); *Wilkins*, 528 F.3d at 798 ("Unlike a false arrest or false imprisonment claim, malicious prosecution concerns detention only '[a]fter the institution of legal process.'").

judgment.[26]  "Typically, damages for a false arrest claim cover the time of detention up until issuance of process or arraignment, and any damages sustained after that must be based on a malicious prosecution claim."[27]

Attempting to save her malicious prosecution claim, Plaintiff argues in her response that she also suffered deprivations after the institution of legal process that could constitute a seizure. She claims that she expended time and effort to respond to the criminal charges and was required to refrain from consuming drugs and alcohol as a condition of her bond.  The Tenth Circuit has noted that "it is unclear how far the Fourth Amendment's protection against unreasonable 'seizures' can reach in the pretrial context."[28]  In *Albright v. Oliver*, Justice Ginsburg notes in her concurring opinion that:

> A person facing serious criminal charges is hardly freed from the state's control upon his release from a police officer's physical grip.  He is required to appear in court at the state's command.  He is often subject, as in this case, to the condition that he seek formal permission from the court (at significant expense) before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction.  Pending prosecution, his employment prospects may be diminished severely, he may suffer reputational harm, and he will experience the financial and emotional strain of preparing a defense.  A defendant incarcerated until trial no doubt suffers greater burdens.  That difference, however, should not lead to the conclusion that a defendant released pretrial is not still "seized" in the constitutionally relevant sense.[29]

Plaintiff alleges that she expended time and effort to respond to the criminal charges and

---

[26]Doc. 74 at 11.

[27]*Williams v. Weber*, 905 F. Supp. 1502, 1512 n. 12 (D. Kan. 1995) (citing W. Keeton, *et al., Prosser and Keeton on the Law of Torts*, § 119, at 888 (5th ed. 1984); and *Singer*, 63 F.3d at 117)).

[28]*Taylor*, 82 F.3d at 1561.

[29]*Albright v. Oliver*, 510 U.S. 266, 278–79 (1994) (Ginsburg, J., concurring).

was required to refrain from consuming drugs and alcohol as a condition of her bond. These alleged deprivations, like those addressed by the District Court of Kansas in *Williams v. Weber*, are not sufficient to warrant the extension of the concept of "seizure" as suggested by Justice Ginsburg.[30] In *Williams*, the plaintiff did not allege that he was held in custody after the baseless charges were filed, and instead alleged "that defendants' conduct deprived him of liberty by requiring him to spend time and money in preparing a legal defense and to stand trial for two days."[31] In declining Justice Ginsburg's suggestion, the court stated that:

> Presumably every case of malicious prosecution entails consequences which are at least this burdensome. Yet Tenth Circuit authority teaches us that not every malicious prosecution claim deserves constitutional treatment under § 1983 . . . If lack of probable cause to prosecute necessarily begets a "seizure" of constitutional dimensions, every malicious prosecution case is a federal one. Moreover, while the Supreme Court has recognized that even pretrial *release* may be accompanied by conditions so burdensome as to effect a significant restraint of liberty . . . it has also commented that the Fourth Amendment does not require probable cause for the institution of criminal charges unless the defendant suffers restraints on liberty other than the condition that he or she appear for trial.[32]

This Court finds that Plaintiff Mary Patterson has failed to allege any "burdensome conditions that effect a significant restraint of liberty," and therefore as a matter of law she has suffered no deprivation of liberty sufficient to prevail on her claim for malicious prosecution

---

[30]*Williams*, 905 F. Supp. at 1512.; *see also Becker v. Kroll*, 494 F.3d 904, 915–16 (10th Cir. 2007) ("Justice Ginsburg's continuing seizure analysis has yet to garner a majority of the justices of the Supreme Court, and we are not compelled to adopt it . . . even if we were inclined to broaden the meaning of seizure beyond our traditional understanding, this case does not present a vehicle for doing so.").

[31]*Williams*, 905 F. Supp. at 1512.

[32]*Id.* (internal footnotes and citations omitted) (emphasis in original).

under § 1983.[33]  Defendant's motion for summary judgment on this claim is granted.

## B. Negligent Use of Force

Plaintiffs Mary and Travis Patterson both assert state law claims for negligent use of force.  Defendants contend that Kansas law does not recognize a claim for negligent use of force by a law enforcement officer in the course of arrest.  Defendants also claim that Plaintiff's factual allegations form the basis of a battery claim, not negligence, because they involve the intentional application of force by Officer Henry in "tackling" Mary and in tasing Travis as well as kneeing him and twisting his thumb at the police station.  Defendants rely on *Baska v. Scherzer*,[34] in arguing that because Plaintiffs' claims are battery claims in disguise, they are barred by the one-year statute of limitations under K.S.A. § 60-514(b).  Lastly, Defendants argue that if such a negligence claim is available, it is barred by discretionary function immunity, citing K.S.A. § 75-6104(e).

These same arguments were addressed by the court in *Price v. City of Wichita*.[35]  The court in *Price* cited the *Baska* decision for the proposition that a court is "not bound by the claims as set forth in the petition," but looks to the substance of the claims.[36]  In recognizing a

---

[33]*See id.*; *see also Mata v. Anderson*, 635 F.3d 1250, 1254 (10th Cir. 2011) (finding restrictions on travel are insufficient to constitute Fourth Amendment seizure under our precedent); *Nielander v. Bd. of Cnty. Com'rs of Cnty. of Republic, Kan.*, 582 F.3d at 1155, 1165 (10th Cir. 2009); *Becker v. Kroll*, 494 F.3d 904, 915 (10th Cir. 2007) (collecting case declining to recognize typical pre-trial release conditions such as receiving a summons, posting bond, restricting travel, and appearing in court, as a seizure); *Nieves v. McSweeney*, 241 F.3d 46, 54–55 (1st Cir. 2001) (finding no Fourth Amendment seizure where appellants were released on their own recognizance, suffered the stress and anxiety of knowing not only that serious criminal charges were pending against them, but also that their reputations had been sullied, they appeared before the criminal court a number of times in the pretrial period, and they endured trial.).

[34]156 P.3d 617, 622 (Kan. 2007).

[35]No. 12-1432-CM, 2013 WL 6081103 (D. Kan. Nov. 19, 2013).

[36]*Id.* at *2 (quoting *Baska*, 156 P.3d at 622).

claim for negligent use of force, the court in *Price* stated:

> The Court recognizes the unusual nature of Price's claim, which attaches a negligence label to an act—stomping—that appears quite intentional. This peculiarity was highlighted in *Nemecheck*, which noted that excessive force and negligent force seem in opposition to one another. *See* 2010 WL 2720668, at *4. Indeed, there are several cases that suggest the court should not allow this claim to go forward. In *Baska*, a Kansas Supreme Court case heavily relied on by defendants, the court used the doctrine of transferred intent to hold that striking an unintended victim was, in substance, an intentional act, and not a negligent act. 156 P.3d at 628.[37]

Nonetheless, the court in *Price* recognized a theory for negligent use of force based on several Kansas cases that are instructive on the issue— "*Deffenbach* [sic] recognized this theory; Judge Lungstrum denied summary judgment on this type of claim in *Clark*; and the Tenth Circuit declined to comment on its merits in *Grauerholz*."[38]

In *Dauffenbach v. City of Wichita*, the Kansas Supreme Court ruled that the trial court did not err in allowing the filing of an amended petition containing a claim for negligence.[39] The court viewed plaintiff's original petition as stating a cause of action for negligence, where plaintiff contended that the defendants did "negligently assault, beat and injure" him.[40] The Kansas Supreme Court went on to state that although police officers ordinarily have immunity on claims arising from performance of their general duties to prevent crime and enforce the law, liability arises where "an officer breaches a specific or special duty owed an individual."[41]

---

[37] *Id.* at *5.

[38] *Id.*

[39] 667 P.2d 380, 384 (Kan. 1983).

[40] *Id.*

[41] *Id.* at 385.

"Such a special duty arises in two circumstances: (1) where there is an affirmative act by the officer causing injury; and (2) when a specific promise or representation by the officer is made under circumstances creating justifiable reliance."[42]  The court listed placing an individual under arrest or committing an assault as examples of situations in the first category.[43]

In *Clark v. Thomas*, the court denied summary judgment, finding that reasonableness of force was a factual question best relegated to a jury.[44]  The court cited *Dauffenbach* as setting forth the standard for an excessive force negligence claim.[45]

The Tenth Circuit Court of Appeals in *Grauerholz v. Adcock*, affirmed on grounds that the officers' use of force was reasonable and necessary, even though the district court had ruled that negligent excessive force did not constitute a claim in Kansas.[46]  The Tenth Circuit noted that because it "concluded that there are no material facts in dispute on the negligent use of excessive force claim, [it did] not reach questions of Kansas law concerning the status of such a claim or the scope of qualified immunity."[47]

Defendants claim that if a negligent use of force claim is allowed, they are immune under the "discretionary function exception" found in K.S.A. § 75-6104(e).  The court in *Price* held that defendants failed to show that the discretionary function exception applied as a matter of

---

[42]*Id.* (citations omitted).

[43]*Id.*; *see also Tichenor v. City of Topeka*, 281 P.3d 597 (Kan. Ct. App. 2012) (Table) (addressing propriety of jury instructions dealing with negligent use of force).

[44]505 F. Supp. 2d 884, 892 (D. Kan. 2007).

[45]*Id.* at 890.

[46]51 F. App'x 298, 300-01, 2002 WL 31579878, at *3 (10th Cir. Nov. 20, 2002).

[47]*Id.* at 301, n.3.

law.[48]  Likewise, in *Clark v. Thomas*, the court noted that the officer's conduct cannot be said to have been "discretionary" for purposes of K.S.A. § 75-6104(e) where guidelines are in place governing the conduct and the discretionary function must involve some element of policy formation.[49]  The discretionary function exception does not shield "'a law enforcement officer who uses an unreasonable amount of force or acts maliciously or wantonly'" during an arrest.[50]

This Court agrees with the reasoning in *Price* and the cases cited therein, and finds that Defendants' motion for summary judgment on Plaintiffs' claims for negligent use of force must be denied.

### C.  Intentional Infliction of Emotional Distress

Both Plaintiffs bring claims for intentional infliction of emotional distress.  "Kansas has set a very high standard for the common law tort of intentional infliction of emotional distress, or, as it is sometimes referred to, the tort of outrage."[51]  There are four elements to the state law tort:  "(1) [t]he conduct of the defendant must be intentional or in reckless disregard of the plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress must be extreme and severe."[52]

---

[48]*Price*, 2013 WL 6081103 at *5.

[49]505 F. Supp. 2d 884, 895 (D. Kan. 2007).

[50]*Roberts v. City of Wichita*, Case No. 10-01292-MLB, 2011 WL 382368, at *3 (D. Kan. Feb. 3, 2011) (citing *Clark*, 505 F. Supp. 2d at 894); *see also Campbell v. City of Leavenworth*, 13 P.3d 917, 922 (Kan. Ct. App. 2000) ("Discretionary immunity would not apply to an excessive force claim which is based on a negligence theory.")).

[51]*Holdren v. Gen. Motors Corp.*, 31 F. Supp. 2d 1279, 1282 (D. Kan. 1998) (citation omitted).

[52]*Nicol v. Auburn-Washburn USD 437*, 231 F. Supp. 2d 1107, 1118 (D. Kan. 2002) (citations omitted).

For an outrage claim to survive summary judgment, the court must first determine as a matter of law, that reasonable fact finders might differ as to: "(1) whether defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and (2) whether plaintiff's emotional distress was so extreme and severe that the law must intervene because no reasonable person should be expected to endure it."[53] These threshold requirements are "'necessarily high to separate meritorious claims from those based on trivialities or hyperbole.'"[54] "If the court determines . . . that reasonable factfinders might differ as to whether defendant's conduct was sufficiently extreme and outrageous and the plaintiff's emotional distress was genuine and so severe and extreme that it caused injury, then it must be left to the jury to determine liability."[55]

1.  Extreme and outrageous conduct:

The Kansas Supreme Court has discussed what type of conduct is extreme and outrageous enough to permit recovery:

> "In *Dotson v. McLaughlin*, 216 Kan. at 210 [531 P.2d 1], Mr. Justice Prager speaking for the court adopted guidelines from the Restatement of Torts.  It was pointed out that recovery must depend on the facts and circumstances of each case but liability may only be found in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.  It was further said liability may

---

[53]*Id.*  The Court notes that the parties disagree as to whether merely wanton conduct is sufficient to support a claim for intentional infliction of emotional distress.  The Court need not resolve this dispute in addressing the two threshold requirement for purposes of summary judgment.

[54]*Id.* (quoting *Rupp v. Purolator Courier Corp.*, 790 F. Supp. 1069, 1073 (D. Kan. 1992)).

[55]*Kincaid v. Sturdevant*, 437 F. Supp. 2d 1219, 1228 (D. Kan. 2006) (quoting *Burgess v. Perdue*, 239 Kan. 473, 476, 721 P.2d 239 (1986)).

be found to exist generally in a case when the recitation of facts to an average citizen would arouse resentment against the actor, and lead the citizen to spontaneously exclaim, 'Outrageous!'

It should be understood that liability does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities. Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind. The law should not intervene where someone's feeling merely are hurt. Freedom remains to express an unflattering opinion and to blow off relatively harmless steam which comes from an uncontrollable temper. Conduct to be a sufficient basis for an action to recover for emotional distress must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society."[56]

Viewing the evidence in the light most favorable to the Plaintiffs, the Court finds that Defendant Henry's conduct falls short of being outrageous. In *McGregor v. City of Olathe, Kansas*, the District Court of Kansas found that the police officers' conduct fell "far short of being outrageous."[57] In that case, the plaintiff, who was under investigation for disorderly conduct, had been instructed that she was not free to leave and acknowledged that she was aware of that fact.[58] She phoned friends to come pick her up, and upon seeing a vehicle she believed to be her friend's, she motioned to the vehicle and said "see ya" to the police officer.[59] As plaintiff was walking away, the officer reasonably perceived that plaintiff was attempting to flee and tackled her to the ground.[60] The officer's upper body was on top of plaintiff and then she was

---

[56]*Taiwo v. Vu*, 822 P.2d 1024, 1029 (Kan. 1991) (citing *Roberts v. Saylor*, 230 Kan. 289, 293, 637 P.2d 1175 (1981)).

[57]158 F. Supp. 2d 1225, 1242 (D. Kan. 2001).

[58]*Id.*

[59]*Id.*

[60]*Id.*

carried to the trunk of her car and slammed on the trunk, then handcuffed and placed under arrest.[61]  The court held that plaintiff's outrage claim failed as a matter of law, finding that the officers' conduct could not "be deemed so outrageous and so extreme that a reasonable member of the community would regard the conduct as utterly intolerable and beyond the bounds of decency in a civilized community."[62]

Likewise, the Court finds under the facts of this case, viewed in the light most favorable to Plaintiffs, Defendant Henry's conduct is not sufficiently extreme and outrageous as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.  Even if the Court were to find that the conduct was sufficient, Plaintiffs' emotional distress is not so extreme and severe that the law must intervene because no reasonable person should be expected to endure it.

2.  Extreme and severe emotional distress:

The second threshold requirement is that plaintiff's emotional distress be sufficiently severe, genuine and extreme that no reasonable person should be expected to endure it.[63]  In the Pretrial Order, Plaintiffs contend that:

> The incident increased Mary's depression and anxiety as well as cause [sic] her humiliation and embarrassment with her unlawful incarceration, arrest and prosecution.  Travis Patterson suffered the pain, suffering, and humiliation associated with being unnecessarily tased, hit with knee strikes, and having his thumb twisted by Defendant Henry.  He also suffered the embarrassment

---

[61]*Id.* at 1232–33, 1242.

[62]*Id.* at 1242.

[63]*Taiwo*, 822 P.2d at 1030 (citing *Roberts*, 230 Kan. at 293–94).

and humiliation of being arrested and prosecuted for a crime he did not commit after watching his mother get assaulted by Defendant Henry.[64]

The Kansas Supreme Court has likewise discussed this requirement:

> "Emotional distress passes under various names such as mental suffering, mental anguish, nervous shock, and includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, embarrassment, anger, chagrin, disappointment, and worry. However, it is only when emotional distress is extreme that possible liability arises. The extreme distress required must be reasonable and justified under the circumstances, and there can be no liability where the plaintiff has appeared to suffer exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor had knowledge. [Citations omitted.] The emotional distress must in fact exist, and it must be severe."[65]

Plaintiff Travis Patterson has failed to show extreme or severe emotional distress. He testified that he is embarrassed "in a way" when someone asks about the Taser marks on his back and he reveals he has been tased. Only distress that is "extreme" or "severe" will result in liability.[66] "Elevated fright, concern, embarrassment, worry, and nervousness do not by themselves constitute sufficient harm to a plaintiff to warrant the award of damages for outrage."[67] "[T]he absence of psychiatric or medical treatment, including medication, weighs against a finding of extreme emotional distress."[68] In their response brief, Plaintiffs have not identified any specific emotional distress allegedly suffered by Travis Patterson. Thus, he has

---

[64]Doc. 74 at 6–7.

[65]*Taiwo*, 822 P.2d at 1030 (citing *Roberts*, 230 Kan. at 293–94).

[66]*Valadez v. Emmis Comm's*, 229 P.3d 389, 395 (Kan. 2010) (citation omitted).

[67]*Id.* (citation omitted).

[68]*Id.* (citation omitted).

not satisfied his burden to come forward with evidence of sufficiently severe emotional distress.

Plaintiff Mary Patterson's emotional distress is a closer call. She testified that she was depressed and taking medication for her depression before the incident. After the incident she suffered nightmares, became more depressed and her doctor increased her dose of depression medication. She said she was paranoid and anxious before the incident, but it became worse after the incident. She submitted Progress Notes from her individual therapy sessions with Andrea Conlee, RN, her Licensed Clinical Social Worker at Comcare of Sedgwick County. The Progress Note dated June 21, 2010, states in pertinent part that: "Denies thoughts of suicide . . . goal is to decrease the symptoms of anxiety . . . Client is very angry, sad, tearful, her son had a warrant for arrest, the police arrived one night and all three taken to police department. Clarify, problem solve what to do next to prepare for court."[69] The July 15, 2010 Progress Note states that the "goal is to stabilize mood," and under the heading "Plan: (Next step, plan for treatment)" states "Continue to stabilize mood: PTSD."[70] Although an expert diagnosis of post-traumatic stress disorder (PTSD) may support an emotional distress claim,[71] the record is not clear that an expert diagnosed Plaintiff Mary Patterson with PTSD as a result of the incident at issue in this case. She suffered from depression, anxiety and paranoia prior to the incident, and the Progress Notes reflect that she was also sad about her son, whom was charged with rape and kidnapping,

---

[69] Doc. 79–10 at 1.

[70] *Id.* at 2.

[71] *See Nkemakolam v. St. John's Military Sch.*, No. 12-2132-JWL, 2014 WL 117258, at *3 (D. Kan. Jan. 13, 2014) (Defendant failed to explain or cite authority to support the argument that PTSD is not sufficiently severe to support an emotional distress claim.); *see also Zhu v. Countrywide Realty*, 165 F. Supp. 2d 1181, 1208 (D. Kan. 2001) (where plaintiff's doctor stated that she has symptoms of post-traumatic stress disorder, the court could not "conclude as a matter of law that a reasonable person should be expected to endure emotional distress of this severity," and denied summary judgment on the claim for intentional infliction of emotional distress.).

and the loss of a job.  Furthermore, "[t]he intensity and the duration of the distress are factors to be considered in determining its severity."[72]

The Kansas Supreme Court has quoted with approval the following:

> There is no laundry list of what qualifies as the requisite level of severity [of emotional distress] . . . .  [I]t is fair to say that headaches, sleeplessness, irritability, anxiety, depression, listlessness, lethargy, intermittent nightmares, and the like would probably not suffice anywhere.
>
> On the other hand, physical symptoms probably would suffice, and if purely mental symptoms are all that apply . . . those symptoms should at least be long lasting and debilitating.[73]

The Progress Notes, when read together, do not reflect long lasting and debilitating symptoms.[74] There can be no liability where the plaintiff has appeared to suffer exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor had knowledge.[75]  There is no evidence that Defendant Henry had knowledge of Plaintiff Mary Patterson's pre-existing depression, paranoia and anxiety.

Construing the facts in a light most favorable to Plaintiffs, the Court cannot find that reasonable fact finders might differ as to: (1) whether Defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and (2) whether Plaintiffs' emotional distress was so extreme and severe that the law must intervene because no reasonable person should be expected to endure it.  Thus, summary judgment in favor of Defendants is

---

[72]*Taiwo*, 822 P.2d at 1030 (citing Restatement (Second) of Torts § 46(1), comments j and k (1963)).

[73]*Id*. (quoting Boston, Kline, & Brown, *Emotional Injuries: Law and Practice* § 22.7 (1998)).

[74]The August 16, 2010 Progress Note states that her mood on a scale of one to ten would be a seven; and the September 13, 2010 Progress Note states that Mary is "[f]eeling better about herself."

[75]*Taiwo*, 822 P.2d at 1030 (citing *Roberts*, 230 Kan. at 293–94).

appropriate on these claims.

      **IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for

Partial Summary Judgment (Doc. 77) is **GRANTED IN PART and DENIED IN PART.**

      **IT IS FURTHER ORDERED BY THE COURT** that Defendants' motion for summary

judgment shall be **GRANTED** as to Plaintiff Mary Patterson's malicious prosecution claim and

as to both Plaintiffs' claims for intentional infliction of emotion distress.

      **IT IS FURTHER ORDERED BY THE COURT** that Defendants' motion for summary

judgment shall be **DENIED** as to both Plaintiffs' claims for negligent use of force.

      **IT IS SO ORDERED.**

Dated: June 5, 2014

                         S/ Julie A. Robinson

                         JULIE A. ROBINSON

                         UNITED STATES DISTRICT JUDGE